ANADARKO PETROLEUM CO. *v.* Robert VENABLE

92-1009                                        850 S.W.2d 302

Supreme Court of Arkansas
Opinion delivered March 22, 1993

*Smith, Stroud, McClerkin, Dunn & Nutter*, by: *Hayes C. McClerkin*, for appellant.

*Crumpler, O'Connor & Wynne*, by: *William J. Wynne*, for appellant.

DAVID NEWBERN, Justice. This is an appeal involving a

question in the law of oil and gas which arises out of the interpretation given three deeds executed and recorded in 1939 and the interest conveyed by the deeds. The grantors in the three separate deeds were, respectively, the Royalls, the Pattons, and the Wigginses. Each deed contained, in effect, two granting clauses of mineral interests. The first clause contained an outright grant, and the second granted an amount dependent upon the amount granted in a certain lease. An issue before the Chancellor, and before us now on appeal, was whether the grant based on the lease was only explanatory of the first grant in each lease or was intended to convey to the grantee of each deed whatever the lease provision would yield. Another issue is whether the claims of the appellee, Robert Venable, are barred by a statute of limitations, estoppel, or laches. The Chancellor held that the second granting clause in each deed, *i.e.*, the one referring to the lease was controlling. He also found the claim of Venable was not barred. We affirm the holding.

Each of the deeds was entitled "Warranty Deed and Perpetual Royalty" and contained the following:

> [A]nd the Grantee [F.W. McClanahan and R.H. Venable] shall at all times subsequent to the execution of this instrument, receive a (13/1920ths) [Royall deed]; (4/1440ths) [Patton deed]; (18/1440ths) [Wiggins deed] part of all oil, gas and other minerals produced and saved from the above described land, free and clear of any expense of drilling any well or wells for the production of said minerals, or any of them, or of the mining of said minerals, or any of them, or of the operation of any well or mine from which said minerals are produced, or from which any one of said minerals is produced, which provision and agreement is a covenant which shall run with the land to the end that it shall be binding upon the Grantors and their heirs and assigns forever.

> It is understood that this land is encumbered with an oil and gas lease executed by *J.G. Tissue, a widower* as Lessors, to *Record Owners* as Lessee, on ___, which lease is recorded in Book ___, at Page ___, of the Deed Records of *Columbia*, County, Arkansas.

> And for the same consideration the Grantors do

hereby bargain, grant, sell, convey and set over onto the Grantee an undivided (13/240ths) [Royall deed]; (4/180ths) [Patton deed]; (18/180ths) [Wiggins deed] part of all royalties on oil or gas produced from the above described land during the term of said lease, or any extension thereof.

However, the Grantee shall have no interest in the purchase price to be paid for any oil and gas lease or leases, or other lease or leases on the land, or any part thereof, made by the Grantors in the future; and the Grantee shall not be entitled to receive any portion of any sum or sums to be paid as delay rental under the terms of any oil and gas lease now or hereafter affecting the land, or any portion thereof or any interests therein, to defer the commencement of a well during the primary term thereof; and the Grantee, his heirs or assigns, shall not be entitled to join in the execution of any such future lease or leases on the land.

The appellant, Anadarko Petroleum Co. (Anadarko), has two producing wells within the Atlanta Field which are subject to the royalty interests conveyed by the deeds. Anadarko executed Division Orders and paid royalties to Venable from 1983 until the filing of the lawsuit in 1991 based on its interpretation of the deeds as granting the Venable interests a right to a fractional share of the proceeds from production equivalent to a one eighth ($1/8$th) royalty, the same royalty interest retained in the Tissue lease which was in place in 1939. Appellee Venable argued that his interest should have been determined from leases which were executed in January, February, and March of 1980 by the descendants of the original mineral lessor mentioned in the deeds. In two of these leases there was provided an overriding three sixteenths ($3/16$ths) royalty interest.

Anadarko argued that Venable was entitled to a lesser proportion limited to that provided in the granting clauses of the 1939 deeds and that any other claim was barred by estoppel, laches, and the statute of limitations. The matter was presented to the Chancellor for consideration on the arguments of counsel and the documentary record supported by trial briefs. The Chancellor found that Venable was due a royalty based on a computation derived from the 1980 leases, two of which provided for 3/16ths

rather than the 1/8th as provided in the 1939 lease. The Chancellor also found the claim was not barred by estoppel, laches, or the running of a statute of limitations.

Anadarko argues first that the Chancellor erred in granting Venable a greater interest than that conveyed by the 1939 deeds. We find no error in the Chancellor's determination that the intent of the 1939 deeds was to convey to Venable whatever royalty rights were held by the grantors as determined by the Tissue lease or leases and that the computation of the royalty using the 3/16th figure in the 1980 leases was proper.

## 1. Interpretation of the deeds

Anadarko calculated Venable's interest in the Division Orders based solely on the deed's initial granting clause without consideration of the subsequent language concerning the lease because it interpreted the latter language to be explanatory only. In support of its position it relies on the decision in *Barret* v. *Kuhn*, 264 Ark. 347, 572 S.W.2d 135 (1978), which essentially held that we would construe deeds in such a way that the granting clause of the deeds would be controlling in the event of an irreconcilable conflict between the *mineral deeds granting clause and other clauses.*

In the Barret case the appellees, or their predecessors, during the 1940s granted essentially identical non-participating royalty interests to the appellants. These deeds gave a fixed interest in any money paid from production of oil and gas from the lands. Subsequently the appellees negotiated with another party and signed other oil and gas leases on the property, granting the working interests. These leases all provided for the appellees to have an overriding royalty if production was obtained. In some instances the overriding royalty amounted to one-eighth (1/8th) and in others a one-sixteenth (1/16th) overriding royalty in addition to the usual one-eighth royalty that was reserved in these leases by the owner. There was no mention in the negotiations for the leases, nor in the leases themselves, of the non-participating royalty holders.

When production was obtained, a division order was prepared setting forth in detail who was to be paid a royalty and in what amount. The division order was the first notice to the parties

that the non-participating royalty holders were making a claim to the overriding royalty payments to be paid to the appellees. The royalty deeds in question were form instruments, headed in bold type "ROYALTY DEEDS", beneath which was the word, "non-participating". The granting clause in the royalty deeds read:

> That _____ for and in consideration of . . . _____,
> . . . do hereby grant, bargain, sell, and convey unto the said _____ and unto its successors and assigns forever, subject, however, to all of the terms, conditions and reservations hereinafter mentioned, an undivided one sixty-fourth (1/64) interest in and to all of the oil, gas and other minerals, in, under and upon the following described lands . . . .

After describing the property, the deeds contained two other relevant clauses; the royalty clause and the production clause. The royalty clause read:

> Provided, that the grantors herein expressly covenant with the grantee that no oil and gas mining lease shall ever be executed covering the above land, or any part thereof, that shall reserve to the grantors herein, their heirs and assigns, as royalty, less than one-eighth of all of the oil and gas produced and saved from said land — and this covenant shall be deemed a covenant running with the land. It is the intention of the parties hereto that the grantee herein, its successors or assigns, shall be entitled to receive hereunder one-eighth of all oil and/or gas run to the credit of the royalty interest reserved under and by virtue of any oil and gas mining lease now in force and effect covering said land, and under any oil and gas mining lease hereafter executed covering said land, or any part thereof; . . . .

What is referred to as the production clause follows the royalty clause and it read:

> [A]nd in any event the grantee herein, its successors or assigns, shall be deemed the owner of and shall be entitled to receive one sixty-fourth of all oil and gas produced and saved from said land or any part thereof.

The appellants in the *Barret* case argued they were entitled to an

interest as described in that part of the royalty clause which read: ". . . the grantee . . . shall be entitled to receive hereunder one-eighth of all oil and/or gas run to the credit of the royalty interest." We said:

> It is our duty to interpret such instruments by trying to make all parts of the instrument harmonize, and stand together, if possible, so as to ascertain the intention of the parties. [Citation omitted.] The granting clause in these deeds says that a one sixty-fourth interest is granted to the oil, gas and minerals produced. This clearly limits the claim of the non-participating holders because if they were to participate in the overriding royalty, they would receive more than a one sixty-fourth interest. Also, this same one sixty-fourth interest is mentioned in the production clause. No doubt it would have been clearer if the parties had said in their instruments that participation would only be in the normal one-eighth royalty, but they did not. However, when examined as a whole, the instrument clearly limits the non-participating interest to one sixty-fourth of the oil, gas and minerals produced.

We concluded that the non-participating royalty owners could not participate in the overriding royalty created by the subsequent leases. As can be seen from the language employed in both sets of deeds, those in the *Barret* case are significantly distinguishable from those employed in this case. The interpretation of deeds advanced by the appellants in the *Barret* case would have rendered the deeds internally inconsistent, elevated the royalty clause over the granting clause, and ignored the stated intent evidenced in the production clause. There are no such problems with the deeds now before us, and while the language they use does not evidence the clarity of intent we found in the *Barret* deeds, it is clear that the language in the initial granting clause is supplemented by the language in the subsequent clause granting to Venable "an undivided . . . part of all royalties on oil or gas produced from the above described land during the term of said lease, or any extension thereof."

The Chancellor found as follows:

> 10. That Plaintiff . . . is entitled to receive a royalty amounting to 1/2 of 127/720 of 1/8 of the oil and gas

produced, saved and marketed under the terms of Lease D from the 29.8 acre tract covered by said Lease D and forming a part of the unit consisting of the Southwest Quarter of the Southwest Quarter (SW/4 SW/4) of said Section 15 and a royalty amounting to 1/2 of 127/720 of 3/16 of the oil and gas produced, saved and marketed under the terms of Lease E from the 10.2 acre tract covered by Lease E and forming the remaining part of said unit, upon which the Tissue "A." 1-15 is being operated. That accordingly, Plaintiff is entitled to receive a total royalty amounting to .012429903 (29.8/40 $\times$ 1/2 $\times$ 127/720 $\times$ 1/8 plus 10.2/40 $\times$ 1/2 $\times$ 127/720 $\times$ 3/16) from the oil and gas so produced, saved and marketed from the 40 acre unit.

11. That Plaintiff . . . is entitled to receive a royalty amounting to 1/2 of 127/720 of 3/16 of the oil and gas produced, saved and marketed under the terms of Lease F from the Northwest Quarter of the Southwest Quarter (NW/4 SW/4) of said Section 15, or to .016536458 of the production under the terms of said Lease F from the Northwest Quarter of the Southwest Quarter of said Section.

■■ The Chancellor interpreted the deeds to mean that they had to be read in conjunction with the lease or leases to arrive at the proper fractions because of the interaction between these two granting clauses. Anadarko does not dispute that the 1939 deeds utilized the amount of royalty which the grantor had retained under the lease to arrive at the fractions stated within the deeds but characterizes that fact as "coincidental" and the language as merely "explanatory". It is our duty to interpret instruments by trying to make all parts of the instrument harmonize, and stand together, if possible so as to ascertain the intention of the parties. *Barret* v. *Kuhn, supra*. The deeds here clearly sought to convey some interest defined by something in the lease "for the same consideration" to Venable. We cannot agree that the language was merely "explanatory" and ignore it as Anadarko would have us to do, as it utilized all the terms of art of conveyance and appears to have granted an additional fractional one-eighth (1/8th) of that which it initially conveyed based on the terms of the lease.

██  While the 1939 lease is not contained in the record, there is no dispute that it expired. The Chancellor clearly considered the 1980 leases to be "extensions" of the original lease, and we have been presented with nothing which would render that conclusion clearly erroneous which is what is required if we are to reverse such a fact finding. *Perry* v. *Nicor Exploration*, 293 Ark. 417, 738 S.W.2d 414 (1987); A.R.C.P. 52(a). Anadarko argues that the deeds do not contemplate a "future lease" but it ignores the language in the deed which applies to the "said lease, or any extension thereof". There is no question that this interpretation by the Chancellor is supported by the deeds.

### 2. Limitations, estoppel, and laches

Anadarko argues that the claim of Venable is barred because he signed and accepted Division Order #0323428 which sets out his interest and at no time did he dispute the calculation of his interest nor did he revoke or rescind the order. The Division Order is a multi-paged document which states in relevant portion:

> The undersigned, and each of us, certify and guarantee that we are the legal owners of and hereby warrant the title to our respective interests as set out below in the oil and casinghead gas . . . .

> \*\*\*

> Effective *first production* and until further notice, subject to the conditions, covenants and directions hereof, you are authorized to sell and deliver Products from the property above described and until further notice give credit for said Product as follows: . . . .

██  A division order is "[a] contract of sale to the purchaser of oil or gas. The order directs the purchaser to make payment for the value of the products taken in the proportions set out in the division order." Williams & Meyers, *Manual of Oil and Gas Terms* § 258 (1985). The division order is typically terminable at the will of either party and may as is alleged here inaccurately reflect the interest owned by a party. Generally under such circumstances the purchaser of the minerals may rely on the division order in making payments to the owners and not be liable in contract or tort for underpayment. 4 Williams & Meyers, *Oil and Gas Law* § 704.5 (1984). In Hemingway, *Law of*

*Oil and Gas* § 7.5 (3d ed. 1991) the following appears: "[b]y the better view, an owner of production who has executed a division order is not so contractually bound or estopped by the division order that he cannot recover for underpayment from owners of production who have been overpaid. He may not recover from the purchaser of production."

Anadarko's argument is that the signing and acceptance of the Division Order calculation should bar Venable from claiming any other formulation under several theories. First Anadarko argues that Venable is barred by the statute of limitations. Arkansas Code Ann. § 16-56-111 (Supp. 1991) provides a five-year limitation on actions concerning instruments in writing. Anadarko claims the statute ran in 1988 on the 1983 division order. The statute provides, however, "partial payment . . . shall toll this statute of limitation."

In *Johnson* v. *Gammill*, 231 Ark. 1, 328 S.W.2d 127 (1959), the parties entered into a written stipulation as to a longstanding indebtedness on January 26, 1952. Several payments were made subsequent to that date and before suit was filed on February 8, 1957. A statute of limitations defense was raised which we rejected, holding that the stipulation constituted the written instrument and the part payments interrupted or tolled the statute with respect to the entire indebtedness. Assuming the division order constitutes the written instrument for purposes of triggering the statute in this case, the earlier payments made under the order tolled the statute.

Second Anadarko claims laches and estoppel bar this claim. It is clear from the language above that all that Venable's signature on the division order represents is the warranting of his title and an authorization for Anadarko to sell the products, giving him credit for his share as calculated. It does not in any way indicate Venable's ratification of the calculation or a waiver of his right to challenge that calculation. We have never been called upon to interpret execution of a division order in the manner suggested by Anadarko. We have, however, considered other arguments concerning the effect of such a document.

In *Shreveport El Dorado Pipeline Company* v. *Bennett*, 172 Ark. 804, 290 S.W. 929 (1927), we rejected an estoppel argument against a royalty owner based on the contents of a division order

directed to the Pipeline Company. The division order directed giving credit for a share of production to a party who had no right to a share. The oil company argued it had no knowledge its payment was in error because the information in the division order setting out an interest to others justified the payment it had made. We found that the oil company's notice of the leases underlying that division order was sufficient notice that the payment was incorrect.

In *Pope* v. *Pennzoil Producing Co.*, 288 Ark. 10, 701 S.W.2d 366 (1986), we said that a division order and a 13-year delay in raising any objections, combined with a ratification and adoption clause in the division order, barred royalty owners by laches and estoppel from challenging the distribution. The document provided in relevant part:

> We . . . do hereby adopt, ratify and confirm each of Pennzoil Producing Company's leases covering these tracts and provided Pennzoil pays royalties in the proportions set out, same will be maintained in full force and effect.

We said:

> We have consistently held that oil and gas properties are unusual and require diligence on the part of parties claiming a property interest. *Walker-Lucas-Hudson Oil Co.* v. *Hudson*, 168 Ark. 1098, 272 S.W. 836 (1925). In *Sanders* v. *Flenniken*, 180 Ark. 303, 21 S.W.2d 430 (1929), this court cited with approval the following language from *Patterson* v. *Hewitt*, 195 U.S. 309 (1904):

> There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which today may have no salable value may in a month become worth millions. Years may be spent in working such property, apparently to no purpose, when suddenly a mass of rich ore may be discovered from which an unusual fortune is realized. Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced.

In *Sanders* we continued discussion of the concept as follows:

> From these citations it will be seen that this court, as well as the Supreme Court of the United States, has uniformly recognized that, on account of the fluctuating and uncertain values of oil and gas lands, parties asserting title thereto must act more promptly than in ordinary cases in which the values remain practically the same. Of course, it is equally well-settled that, when the question of laches is an issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known to him were such as to put the duty of inquiry upon a man of ordinary intelligence.

These cases establish that laches or estoppel may flow from execution of a division order; however, in this case Venable first sought an accounting for and then judgment for the proceeds which were withheld under Anadarko's calculation in the division order. "The equitable doctrine of laches is not applied in actions for damages, *for accounting*, for the recovery of money or property fraudulently obtained, and the like." [Emphasis supplied.] *Peek* v. *Brickey*, 300 Ark. 354, 779 S.W.2d 152 (1989); S. Symons, *Pomeroy's Equity Jurisprudence*, 917 p. 600 (5th ed. 1941). Additionally, laches is based on the theory that it is the unreasonable delay of the party seeking relief under such circumstances as to make it inequitable or unjust for the party to seek relief now. *Reynolds* v. *Smackover State Bank*, 310 Ark. 342, 836 S.W.2d 853 (1992). Venable asserts he had no knowledge of the contents of the 1980 leases prior to filing suit. There is nothing in this record to contradict that assertion, and we must assume that the Chancellor believed this to be the case. The Chancellor is in the best position to assess the credibility of witnesses, and where an issue turns heavily upon credibility, we will defer to the Trial Court. *First Nat'l Bank* v. *Mercantile Bank*, 304 Ark. 196, 801 S.W.2d 38 (1990).

Also in the *Reynolds* case we pointed out that for silence to constitute an estoppel there must be both the opportunity and the duty to speak. *Lavaca School Dist. No. 3* v. *Charleston School Dist. No. 9*, 304 Ark. 104, 800 S.W.2d 703 (1990). The action of the person asserting the estoppel must be the natural result of the silence, and the silent party must be in a

situation to know that someone is relying on the silence to his detriment. Again, Venable's lack of knowledge precludes the doctrine of estoppel from barring his claim.

Finally, in *Worth* v. *Civil Serv. Comm'n*, 294 Ark. 643, 746 S.W.2d 364 (1988) we said:

> Estoppel is a doctrine which involves both, not just one, of the parties. *Continental Ins. Companies* v. *Stanley*, 263 Ark. 638, 569 S.W.2d 653 (1978). The party claiming estoppel must prove he relied in good faith on some act or failure to act by the other party, and that, in reliance on that act, changed his position to his detriment. *Christmas* v. *Raley*, 260 Ark. 150, 539 S.W.2d 405 (1976). Here, the appellee civil service commission has not shown that it detrimentally changed its position based upon an act or failure to act by appellant. Thus, the doctrine of estoppel is not applicable against the appellant.

> Similarly, the doctrine of laches is not applicable because it too requires a detrimental change in the position of the one asserting the doctrine as well as an unreasonable delay on the part of the one against whom it is invoked. *Padgett* v. *Bank of Eureka Springs*, 279 Ark. 367, 651 S.W.2d 460 (1983). Here, twelve months did not amount to an unreasonable delay in filing the suit, and the commission simply did not change its position as the result of a delay.

The scant record in this case has given us problems with resolving this matter. It is absolutely devoid of any information regarding any payments made by Anadarko. As far as we can tell, however, there was no issue before the Chancellor with respect to any rights of innocent third parties which might have an effect on Venable's entitlement.

As we cannot say the Chancellor erred in determining the amount due to Venable pursuant to the 1939 deed, and as we conclude Venable's claim was not barred by a statute of limitations, estoppel, or laches, the decree is affirmed.

CORBIN, J., not participating.