**ENTERGY SERVICES, INC. and Entergy Arkansas, Inc., Plaintiffs,**

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant.**

No. 8:98CV00345.

United States District Court, D. Nebraska.

Jan. 28, 1999.

Gerald L. Friedrichsen, William J. Riley, Fitzgerald, Schorr Law Firm, Omaha, NE, Deborah E. Lamb, Tom F. Phillips, Frederick R. Tulley, John P. Murrill, Brandon Kelly Black, Taylor, Porter Law Firm, Baton Rouge, LA, Leon Holms, Steven W. Quattlebaum, James E. Hathaway, III, Williams, Anderson Law Firm, Little Rock, AR, C. Michael Loftus, Frank J. Pergolizzi, Andrew B. Kolesar, III, Slover, Loftus Law Firm, Washington, DC, Otis H. Storey, Entergy Services, Inc., Little Rock, AR, for Plaintiffs.

Patrick B. Griffin, Kutak, Rock Law Firm, Omaha, NE, Beverly S. Greer, Union Pacific Law Dept., Omaha, NE, Jay T. Smith, Harris Weinstein, Alessio D. Evangelista, Corinne A. Goldstein, Covington, Burling Law Firm, Washington, DC, Frederick W. Bradley, Liskow, Lewis Law Firm, New Orleans, LA, for Defendant.

## MEMORANDUM AND ORDER

STROM, Senior District Judge.

This case involves a breach of contract suit by Entergy Services, Inc. ("ESI") and Entergy Arkansas, Inc. ("EAI") (hereinafter collectively referred to as "Entergy") against Union Pacific Railroad ("UP") based on Rail Transportation Agreements whereby UP was to transport coal from the Powder River Basin ("PRB") in Wyoming and Montana to Entergy's coal-fired power plants in Arkansas. Entergy originally brought this suit seeking liquidated damages, actual damages and judicial cancellation of the contract for UP's alleged failure to deliver coal. Also contained in this law suit is an allegation that UP breached its covenant of good faith. However, discovery on the issue of good faith has been postponed until Phase II of this case. At the conclusion of Phase I, Entergy filed a motion for Partial Summary Judgment (Filing No. 76) and UP filed a Motion for Summary Judgment (Filing No. 74). In short, the parties ask the Court to interpret their contract and determine (1) whether UP breached the contract, and (2) whether the liquidated damages provision in the contract provides Entergy's exclusive remedy.

## FACTS

For purposes of these motions, the following facts appear to be undisputed. Entergy operates two coal-fired power plants designed to burn low-sulphur coal. One is located near Redfield, Arkansas, in Jefferson County ("White Bluff Station") and one is located near Newark, Arkansas, in Independence County ("Independence Station"). Prior to Entergy's contract with UP, Entergy (formerly known as Arkansas Power & Light Company ("AP & L")) had its coal delivered to both plants pursuant to a joint-line common carrier tariff, which provided for coal movement via the Burlington Northern Railroad Company ("BN") from the PRB to Kansas City, Missouri, and then via the Missouri Pacific Railroad ("MP") from Kansas City to the Entergy Stations. In 1980, Congress passed the Staggers Rail Act which gave the railroads the ability to enter into rail transportation contracts with shippers, rather than requiring all rail traffic to move pursuant to tariff and regulatory rules. (Gough Affidavit ¶ 5). Entergy began looking for competitive bids for a rail transportation contract to replace its tariff arrangement. (Plaintiff's Counter-Statement of Facts ¶ 4). Besides considering its current transportation via BN and MP, Entergy investigated transporting coal under an arrangement with the Chicago & North Western Transportation Company ("CNW"), Western Railroad Properties ("WRPI") (a wholly-owned subsidiary of CNW), UP, and MP. Under such an arrangement, WRPI would be responsible for transporting the coal over rail lines it owned from the PRB through Shawnee Junction, Wyoming, and then to South Morrill, Nebraska. (See Exhibit 5 to Gough Affidavit). UP would then be responsible for transporting the coal over rail lines it owned from South Morrill, Nebraska, to Kansas City, Missouri. Id. Finally, the last leg of the trip required shipment via MP from Kansas City, Missouri, to both of Entergy's Stations in Arkansas. Id. En-

tergy also considered a third option of transporting its coal via a proposed coal slurry pipeline that was being developed by Energy Transportation System, Inc. ("ETSI"). (Plaintiff's Counter–Statement of Facts ¶ 5). Entergy received bids under all three of these transportation plans. After the bidding process, Entergy awarded a rail transportation contract to UP/CNW/MP. Negotiations between Entergy and UP/CNW/MP ensued over the next few years to draft acceptable contract terms.

As a result of these negotiations, two separate agreements were entered into in 1983 to govern the transportation of coal to Entergy's plants. Each agreement covered a separate geographic portion of the coal movement. The 1983 Rail Transportation Agreement between AP & L (now Entergy), UP, WRPI, and CNW (the "1983 UP Agreement") covered the movement of coal from the coal mines in the PRB to Kansas City, Missouri. A separate rail transportation agreement between AP & L (hereinafter "Entergy") and MP (the "1983 MP Agreement") governed the movement of coal from Kansas City, Missouri, to the White Bluff and Independence Stations. The 1983 UP Agreement obligated Entergy to ship a minimum of 90% of all PRB coal with these railroads. (1983 UP Agreement, Articles VI.A, VI .B). In exchange, UP agreed to transport these amounts of coal within certain Elapsed Transit Times.[1] (1983 UP Agreement, Article IX.A). The original term of the 1983 Agreements was twenty years with option periods available. The parties subsequently agreed to a duration of thirty years also with option periods available. The 1983 Agreements also contained a choice of law provision providing that the contract shall be governed according to Arkansas law. (See 1983 UP Agreement, Article XIX, incorporated by the 1991 Interim Agreement § 20; 1983 MP Agreement, Article XX). In December of 1982, during the

---

1. The term "Elapsed Transit Time" as used in the original 1983 Agreement and as it continues to be used in the 1991 Interim Agreement, refers to the number of hours required for a round trip between the coal mine and the power plant, excluding loading and unloading time, delays attributable to force majeure conditions, delays attributable to Entergy, time the train is held on constructive placement, delays attributable to the train's own derailment and time when the train is not in UP's possession. (1991 Interim Agreement § 8.A.1). This time period is sometimes also referred to as a "cycle time."

negotiations of the 1983 agreements, UP merged with MP. (Gough Deposition at 16). At some point, UP also combined with CNW (WRPI), and UP is currently the sole railroad party to the Entergy contractual agreements. (Jensen Affidavit ¶ 3).

In May of 1989, UP closed its "Carthage Subdivision" line, which was the route from Kansas City, Missouri, through Pleasant Hill, Missouri, and Carthage, Missouri, and then through the Ozark Mountains to Newark, Arkansas, where the Independence plant is located. (Jensen Affidavit ¶ 7). Although the movement of coal to the White Bluff Station was unaffected by the closure of the Carthage Subdivision (Jensen Affidavit ¶ 8), the closure resulted in coal trains having to approach the Independence Station from the south, i.e. from Kansas City then south via Okay Junction, Oklahoma, to North Little Rock, Arkansas, and then north from there to Newark, Arkansas. (Jensen Affidavit ¶ 8, Exhibits 7, 8). The new route to the Independence Station was 353 miles longer round trip than the old Carthage Subdivision route. (Jensen Affidavit ¶ 9). UP offered Entergy a refund of 8 cents per ton for all coal transported to the Independence Station via the longer route to compensate for increased wear and tear on the railcars. *Id.* After the closure of the Carthage Subdivision, the parties did not amend the Elapsed Transit Time of 133 hours for the Independence Plant in the 1983 agreement. *Id.*

In 1991, Entergy was looking at shipping alternatives, including: (1) coal by wire,[2] (2) obtaining some coal via BN and (3) an option to burn more coal. (Jacob Deposition at 130–32). Discussions were subsequently held between Entergy and the UP railroads whereby Entergy agreed to ship 100% of its PRB coal or 10 million tons annually after 1990 via WRPI, UP and MP in exchange for reduced rates. (1991 Interim Agreement § 5.A.) These agreements were reflected in the 1991 Interim Agreement ("Interim Agreement").[3]

Under the 1991 Interim Agreement, Entergy agreed to provide a notice to UP, within thirty (30) days of the upcoming month, stating the total number of tons of coal it would tender during that month—i .e., the "Shipper's Declared Monthly Volume Commitment." (Interim Agreement § 5.F.2). The total number of tons contained in three consecutive Shipper's Declared Monthly Volume Commitment notices constituted the "Shipper's Declared Quarterly Volume Commitment" for each calendar quarter. (Interim Agreement § 5.F.3). UP then was required to deliver these amounts of coal during that quarter without exceeding the Elapsed Transit Times of 160 hours for the White Bluff Station, and 133 hours for the Independence Station. (Interim Agreement § 8.A.2). If UP was deficient in transporting the Declared Quarterly Volume Commitment during a calendar quarter due to a failure to meet these Elapsed Transit Times, a Deficit Tonnage was calculated.[4] (Interim Agreement § 8.B). UP was allowed to make up the deficits in the next quarter by using its own rail cars, or if it lacked sufficient railcars, the railroad could use Entergy railcars at Entergy's option by paying a lease rate. (Interim Agreement §§ 8.B.3, 8.B.7.) If the deficit was still not made up in the next quarter, the Interim Agreement provided that UP would pay certain liquidated damages to Entergy. (Interim Agreement § 8.B.5.)

The Interim Agreement, while superseding certain provisions in the 1983 agreements, incorporates other provisions from the 1983 agreements. One of these incorporated provisions is the clause found in the Interim Agreement § 22 entitled "Termination." This clause was retained from the 1983 UP Agreement and provides: "Termination of this Agreement for any reason shall not release any party from any obligation that may

---

2. A system whereby the coal is shipped to a nonowned power plant, used to generate electricity which is then sold to plaintiff.

3. The Interim Agreement expires on Dec. 31, 1999. (Jensen Affidavit ¶ 12).

4. Deficit Tonnage was calculated as the lesser of (i) the difference between the number of Tons actually transported and the Shipper's Declared Quarterly Volume Commitment; or (ii) the following formula: Total Service Shortfall divided by the Railroad's Service Standard multiplied by 11,730 Tons. (Interim Agreement § 8.B .2).

have accrued prior to such termination, nor shall it preclude any party from exercising any remedies it may have in law or equity to enforce such obligations." (1983 UP Agreement, Article XXI).

The parties proceeded with transportation under this Interim Agreement, but in the summer of 1993, the Missouri and Mississippi Rivers flooded the Midwest, damaging numerous rail lines. (Jensen Affidavit ¶ 20). In addition, Entergy increased its demand for coal in early 1994. (Jensen Affidavit ¶ 22, Exhibit 20). Due to the floods and increased demand, UP was unable to deliver Entergy's Declared Volume Commitments, resulting in Deficit Tonnage in 1994. (Jensen Affidavit ¶ 23). To deal with these deficits, Entergy and UP entered into a letter agreement dated December 18, 1995. This letter agreement addressed, in part, the 1994 deficit of 2.7 million tons of coal. UP agreed that it would transport to Entergy not less than 12.5 million tons of coal during the calendar year 1995, and not less than 13.5 million tons of coal during the calendar year 1996. (Answer ¶ 7). Operating under this 1995 letter agreement, UP failed to deliver 312,233 of the tons in 1995 for which UP paid Entergy approximately $1.1 million in liquidated damages. (Entergy's Response to Interrogatory No. 1; Plaintiff's Counter Statement of Facts ¶ 20). In 1996, the parties reduced the tonnage to 12.85 million tons for 1996, which is what UP delivered in that year. (Jensen Affidavit ¶ 27). Thus, the parties agree that there were no deficits for 1996.

During the first six months of 1997, Entergy was engaged in an inventory reduction program, and therefore did not have a need for its usual volumes of coal deliveries. (Plaintiff's Counter–Statement of Facts ¶ 27(a)). Entergy's coal inventory reduction program contained a target of reducing its inventory to one million tons by the end of 1997. (Gray Deposition at 181). By September of 1997, UP was experiencing system-wide service difficulties. (Gough Affidavit ¶ 32). UP contends that it delivered all the coal Entergy was willing to accept during the first half of 1997. (UP's Response to Plaintiff's Statement of Facts Not in Dispute ¶ 26.) On the other hand, Entergy claims that UP created Deficit Tonnage during the first half of 1997. It is undisputed that UP failed to make-up some deficits from 1997 and the first half of 1998. (UP's Brief in Support of Summary Judgment at 12; UP's Response to Entergy's Statement of Material Facts Not in Dispute at ¶ 26). The exact amounts of the deficits and the amounts UP claims to have made-up in 1997 and 1998 are disputed. However, a determination of the actual deficits for 1997 and 1998 and the amounts made-up are not material to these summary judgment motions. UP further acknowledges that at some point in time during 1997, it was not achieving the contractual Elapsed Transit Times. (Gough Affidavit ¶ 31). However, the parties also dispute when and how many times UP exceeded these contractual cycle times. These disputes also are not material to this Court's determination of these summary judgment motions.[5]

Entergy filed a motion for Partial Summary Judgment, asking the Court to find that (1) UP breached the Rail Transportation Agreements with Entergy by incurring and not making up deficits in the transportation of coal to Entergy, and (2) the liquidated damages specified in the Rail Transportation Agreements are not Entergy's exclusive remedy for UP's breaches of contract. UP filed a motion for summary judgment, asking the court to dismiss Entergy's complaint for breach of contract because UP did not breach the contract and the liquidated damages provision in the Rail Transportation Agreement constituted Entergy's exclusive remedy for coal-delivery shortfalls. These are the two motions which the Court will address in this memorandum and order.

## II. DISCUSSION

In its motion, Entergy alleges that UP breached its obligations under the agree-

---

5. It seems to this Court that the parties' differences regarding the calculations of Elapsed Transit Times and Deficit Tonnages, including Entergy's contribution to deficits by refusing to use Distributed Power during UP's service crisis (*See* Gough Affidavit ¶ 33) are issues which should be addressed when determining damages and are not appropriate for these summary judgment motions.

ments in the last two quarters of 1997 and the first two quarters of 1998 by (1) failing to deliver the quantities of coal nominated, and (2) failing to make up deficits.[6] Entergy alleges that from the first quarter of 1997 through the second quarter of 1998, UP failed to deliver almost three million tons of coal. (Jewell Affidavit dated Sept. 28, 1998 ¶ 20.) As a result of UP's breach of contract, Entergy alleges that it was forced to curtail electricity generation at both plants for nine months. (Jewell Affidavit dated Sept. 28, 1998 ¶ 19). Entergy believes that UP's past breaches of contract rise to the level of material breach and entitle it to judicial cancellation of the contract or at least the right not to perform, actual damages, and liquidated damages.

UP contends that failing to deliver the coal within the average Elapsed Transit Times specified in the Interim Agreement does not constitute a "breach" because the Elapsed Transit Times are not stand-alone contractual guarantees. Rather, UP contends that the Elapsed Transit Times are one of the elements contained in the remedial provisions of the contract which determine whether Deficit Tonnages have occurred. While UP admits that there were shortfalls in coal delivery, UP contends that these shortfalls do not constitute a "breach." UP argues that it did not breach its duty to deliver coal because it views its duty under the contract as a duty to deliver coal, and if it could not, to pay liquidated damages as compensation fox Entergy obtaining alternate fuel. UP argues that even if there was a breach, cancellation of the contract is not available as a remedy. UP contends that the liquidated damages clause under the contract is Entergy's sole and exclusive remedy, precluding actual damages and cancellation.

As a result of the parties' divergent views of their contract, this Court is asked on summary judgment to interpret the Entergy–UP contract as a matter of law. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The mere existence of an alleged factual dispute between the parties will not defeat a motion for summary judgment. *Guinness Import Co. v. Mark VII Distrib., Inc.*, 153 F.3d 607, 611 (8th Cir.1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* Summary judgment is particularly appropriate where the unresolved issues are primarily legal rather than factual. *Schuver v. MidAmerican Energy Co.*, 154 F.3d 795, 799–800 (8th Cir.1998). The meaning of an unambiguous contract presents a question of law appropriate for summary judgment. *McCormack v. Citibank, N.A.*, 100 F.3d 532, 538 (8th Cir.1996). On a motion for summary judgment, the court must view all evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

## ENTERGY'S MOTION

### A. Breach of Contract

 It is well settled that when performance of a duty under a contract is contemplated, any nonperformance of that duty is a breach. *Zufari v. Architecture Plus*, 323 Ark. 411, 914 S.W.2d 756, 761 (1996) (citing Restatement (Second) of Contracts § 235(2)). However, this case requires a determination of exactly what constituted UP's duty under these contracts. The interpretation of a contract is controlled by the intention of the parties. *Les–Bil Inc. v. General Waterworks Corp.*, 256 Ark. 905, 511 S.W.2d 166, 169 (1974). Entergy contends that UP's duty was to deliver coal to Entergy's stations in Arkansas. UP contends that its duty was to deliver coal or to compensate Entergy through liquidated damages. UP essentially

---

6. Entergy also alleges that over the course of several years, UP has breached its duty of good faith by engaging in the practice of "rolling deficits," by creating a monopoly, and by UP's performance targets and traffic prioritization, but these issues have been postponed until Phase II of this litigation, after a determination of this summary judgment motion.

asks this Court to interpret the contract as one which allows UP to render alternative performances, i.e., either to deliver coal or to pay liquidated damages. A contract is considered an alternative contract where "it is found that the parties have agreed that either one of the two alternative performances is to be given by the promisor and received by the promisee as the agreed exchange and equivalent for the return performance rendered by the promisee." 5 A. Corbin, Corbin on Contracts § 1082, at 464 (1964). However, "[w]here a contractor promises to render a certain performance or, in default thereof, to pay a definite sum as liquidated damages, he has not made an alternative contract." *Id.* at § 1082, at 462. For the reasons that follow, the Court believes that the Entergy–UP contract falls into this latter category of a non-alternative contract.

▮▮▮ The court's duty is to interpret instruments by trying to make all parts of the instrument harmonize, and stand together, if possible, so as to ascertain the intention of the parties. *Anadarko Petroleum Co. v. Venable,* 312 Ark. 330, 850 S.W.2d 302, 306 (1993). Under the Entergy–UP contract, UP's duty was to deliver coal and to pay liquidated damages when it defaulted in doing so. The structure of the Interim Agreement supports the interpretation that the performance Entergy bargained for was delivery of coal. The contract further provided for certain payments in case of a default to serve as compensation for obtaining alternate fuel supply. The Interim Agreement begins by stating UP's contract obligations, or "Service Standards," (Interim Agreement § 8.A) followed by separate subsections which deal with calculating deficits and liquidated damages (Interim Agreement § 8.B). UP's contractual obligations to deliver coal within certain cycle times are not located in the same section as the liquidated damages provision. This suggests that the liquidated damages would apply only when there was a default in delivering coal. In addition, nowhere in either the service standards section or the liquidated damages section does the word "or" appear which would indicate that an alternative performance would be acceptable. In fact, the language in the Service Standards subsection provides that "Railroad

shall perform service such that Railroads' Elapsed Transit Time averaged over each fixed calendar quarter ... shall not exceed one hundred sixty (160) hours for all trains destined for White Bluff, Arkansas, nor one hundred thirty-three (133) hours for all trains destined for Newark, Arkansas." (Interim Agreement § 8.A.2). The use of the word "shall" indicates that UP has an obligation to deliver coal within certain time cycles and negates the argument that the contract allowed UP to either deliver the coal or pay liquidated damages. This language further negates UP's argument that the Elapsed Transit Times were not contractual obligations but merely part of the damages calculation. It is the duty of courts to enforce contracts as they are written and in accordance with the ordinary meaning of the language used and the overall intent and purpose of the parties. *Hancock v. Tri-State Ins.,* 43 Ark.App. 47, 858 S.W.2d 152, 154 (1993). From the language and structure of the contract, UP must have understood that its primary performance obligation was to deliver the coal to Entergy. The liquidated damage provision establishes the formula for calculation of liquidated damages as compensation for obtaining alternate fuel supply, in case of default.

The language from the liquidated damages provision also supports this interpretation. If UP failed to deliver the coal within the cycle times that quarter, deficits were calculated and UP was allowed to make-up these deficits in the next quarter. Allowing UP to make-up coal deliveries further evidences that obtaining coal was central to the contract. Under the Entergy–UP contract, the liquidated damages became applicable only when UP defaulted in its performance of making up the deficits. The contract provides that "*if,* at the end of the succeeding quarter ... Railroads have failed to make-up all Deficit Tonnage ... Railroad shall pay ... liquidated damages." (Interim Agreement § 8.B.5) (emphasis added). This language conforms to the common understanding that liquidated damages by definition are an agreed-upon remedy in the event of a breach. The Court finds that the liquidated damages were intended to be an agreed-upon

remedy for UP's breach, and not an alternative performance.

In *Public Service Co. of Oklahoma v. Burlington Northern Railroad Co.*, 53 F.3d 1090, 1098 (10th Cir.1995), the Tenth Circuit interpreted contract language in a Coal Transportation Agreement which was remarkably similar to the contract between Entergy and UP. In the *Public Service Co.* contract, a utility company agreed to tender a minimum amount of coal via Burlington Northern Railroad (BN) annually and agreed to provide notices to BN declaring such amounts. In exchange, BN agreed to transport the coal at a base rate annually. The liquidated damages provision in that case provided that "[i]n the event Utility fails to tender to BN for transportation the agreed to minimum annual volume requirement for any calendar year as required under this Agreement, Utility shall have a 'tonnage shortfall.' In such event, Utility agrees to pay the following sum to BN as liquidated damages, and not as a penalty." *Public Service Co.*, 53 F.3d at 1098. The parties shipped the agreed-upon amounts of coal annually under the Agreement until 1992 when the high rate for hauling coal under the Agreement made it economically advantageous for the Utility to pay the railroad liquidated damages. *Id.* at 1095. The Utility brought a declaratory judgment action alleging, among other things, that it had not breached the agreement. The Tenth Circuit held that the utility company's commitment to ship coal was not one of two acceptable performances and that the utility company did not have the option to pay liquidated damages to BN as an acceptable performance. *Id.* at 1099.

While the roles are reversed in *Public Service Co.* from the parties in this case, nevertheless, the Tenth Circuit's construction of those rail transportation contracts is applicable to this case. In a situation where it became economically advantageous not to perform a duty under the contract, the court held that the language of the contract established the parties had duties to perform and nonperformance of those duties resulted in a breach of the contract by that party. That is the case in the Entergy–UP agreement. UP had a duty to deliver coal and for each month in which deficits were not made-up, UP breached its duties under the contract. Accordingly, to that extent, the first part of plaintiff's motion for summary judgment will be granted.

## UP'S MOTION

### B. Liquidated Damages as the Exclusive Remedy

UP seeks a determination that the liquidated damages clause in the Interim Agreement provides Entergy's sole remedy for UP's breach. Entergy seeks a ruling that its remedies for UP's breaches are not limited to recovery of liquidated damages.

A liquidated damages provision is generally "not a limit on *remedies*, but instead provide[s] an agreed-upon measure of *damages.*" *Eastern Elec. Apparatus Repair Co., Inc. v. Jefferson Smurfit Corp.*, 1994 WL 419851 *2 (S.D.Ill.1994) (emphasis added), *aff'd* by 29 F.3d 306 (7th Cir.1994). For example, it has been held that a "liquidated damages clause does not ... preclude other remedies available at law or equity, absent the clear intention of the parties to the contrary." *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957, 964 (D.Mass.1991); *Fletcher v. United States*, 303 F.Supp. 583, 587 (N.D.Ind.1967), aff'd, 436 F.2d 413 (7th Cir.1971); 5A A. Corbin, Corbin on Contracts § 1213 (stating that "[t]he fact that a contract contains a provision for the payment of a penalty or of liquidated damages in case of breach does not in itself make specific performance unavailable as a remedy."). There is no language in the Interim Agreement § 8.B.5 indicating that liquidated damages are to be the sole remedy in the event of a breach. The liquidated damages clause of the Interim Agreement provides as follows:

> ... if, at the end of the succeeding calendar quarter ... Railroads have failed to make up all Deficit Tonnage to a Destination for reasons solely attributable to Railroad, *Railroads shall pay to Shipper,* in accordance with Section 15, *not as a penalty but as compensation for obtaining alternate fuel supply in the form of liquidated damages,* agreed upon as rea-

sonable, a Deficit Service Payment for all remaining Deficit Tonnage to Newark, Arkansas and/or White Bluff, Arkansas, equal to 20% of the weighted average Agreement Rate....

(Interim Agreement § 8.B.5) (emphasis added). The liquidated damages provision contains no words of exclusivity indicating that it was intended to be the exclusive remedy for breach. In fact, § 8.2.5 can be compared with the liquidated damages provision in the 1991 Interim Agreement implicated when Entergy fails to perform. This liquidated damages provision states that in the event the Shipper (i.e., Entergy) fails to perform, the Shipper shall pay "as compensation for lost traffic volumes or added service expenses in the form of liquidated damages, agreed upon as reasonable, *and intended by the parties to be in full settlement for Shipper's failure* to meet its Minimum Annual Volume Requirement." (Interim Agreement § 5.D). It is apparent from this provision that the parties clearly knew how to draft a liquidated damages provision which was intended to be in full settlement for a breach. In interpreting a contract, the whole context is to be considered even though the immediate object of inquiry is the meaning of an isolated clause. *North v. Philliber*, 269 Ark. 403, 602 S.W.2d 643, 645 (1980). Thus, this liquidated damages clause does not preclude all other remedies available at law or equity to Entergy.[7]

▌ Moreover, the liquidated damages provision does not preclude Entergy's common law right not to perform if UP's breach amounts to a material breach. A material failure of performance operates as the nonoccurrence of a condition. Restatement (Second) Contracts § 237 cmt. a. This nonoccurrence of a condition either prevents performance of duties from becoming due or discharges the non-breaching party from performing its duty. Restatement (Second) Contracts § 225. If Entergy can prove that UP materially breached this contract, it is entitled to not perform its remaining duties under the contract. *See Economy Swimming Pool Co. v. Freeling*, 236 Ark. 888, 370 S.W.2d 438, 440 (1963) (stating that where there is a material breach of contract or substantial nonperformance, the injured party is entitled to rescission of the contract); *Grayling Lumber Co. v. Hemingway*, 128 Ark. 535, 194 S.W. 508, 509 (1917) (providing that it is basic contract law that "The failure of one party to a contract to comply with its terms releases the other party from compliance with it."). As Entergy notes, determining materiality of the breach is a fact question and cannot be decided on summary judgment.[8]

### C. Liquidated Damages Provision as Affecting Actual Damages

▌ Although the liquidated damages provision is not Entergy's exclusive remedy, the provision precludes Entergy from seeking its actual monetary damages to a certain extent. The language of the liquidated damages clause in § 8.B.5 provides that UP "shall" pay to Entergy liquidated damages. "A 'shall' provision for liquidated damages gives the party who does not breach the contract only one option: he can sue for specific performance, but he cannot sue for actual damages; the stipulated figure is the only option he has for damages." *See McMaster v. McIlroy Bank*, 9 Ark.App. 124, 654 S.W.2d 591, 594 (1983). The court in *McMaster* found that the word "shall" is contrary to using the word "may" which would give the non-breaching party the added option of suing for actual damages or for the liquidated damages amount. *Id.* In another case, the court found that where the

---

7. UP argues that the absence of a termination-upon-default clause, which was omitted from the contract as part of the pre–1983 contract negotiations, precludes Entergy from canceling the contract. This argument is without merit. General contract law provides that parties "are not required to state in the agreement all of the remedies which the law gives them and which they may seek, and merely because they specifically provided for a certain remedy does not preclude other remedies available to them under

the law in the event of a breach." *Brian McDonagh v. Moss*, 207 Ill.App.3d 62, 151 Ill.Dec. 888, 565 N.E.2d 159, 161 (1990).

8. Whether the 1995 Letter Agreement precludes Entergy from presenting evidence of UP failures to deliver coal prior to 1997 in order to establish a material breach is an issue to be addressed in conjunction with the materiality issue.

contract language used the word "shall," the non-breaching party was entitled only to the liquidated sum and not the actual amount of damages. *Hearrell v. Rogers,* 7 Ark.App. 230, 646 S.W.2d 703 (1983). *See also In re ATG Electronics, Inc.,* 1997 WL 563609, *1 (Bankr.W.D.Tenn.1997) (because the contract contained a provision for liquidated damages which used the word "shall" in the event of a breach, the non-breaching party was limited to that contractual term and was precluded from seeking actual damages); *Brewer v. Myers,* 545 S.W.2d 235, 237 (Tex.Civ.App. 1976) (making a stipulation for liquidated damages binds the shipper "to accept such sum as compensation for its loss resulting from the happening of the contingency named, and therefore the shipper cannot sue for actual damages."). Thus, the liquidated damages provision prevents Entergy from arguing that it has the option of electing either the liquidated amount or the actual damages.[9]

However, it is possible that a liquidated damages clause is exclusive as to one kind of harm, but that it does not cover other harms at all, as to which normal damages would be recoverable. 3 Dan E. Dobbs, *Law of Remedies,* § 12.9(5) at 266 (2d ed.1992). In other words, a stipulated damages clause may address only one of several possible breaches. *Id.* at 268. The liquidated damages provision at issue in this case provides that if UP fails to make up its Deficit Tonnage, UP shall pay liquidated damages to Entergy "not as a penalty but *as compensation for obtaining alternate fuel supply.*" (Interim Agreement § 8.B.5) (emphasis added). The express language of this provision states that UP will pay the stipulated amount of liquidated damages for Entergy's cost of obtaining alternate

fuel. Thus, Entergy cannot claim as actual damages the amount it spent to obtain alternate fuel supplies because this amount is covered by the liquidated damages provision.

The liquidated damages provision does not preclude Entergy from seeking any other damages which it may have sustained as a result of UP's failure to deliver coal. *E.g. In re Ilana Realty, Inc.,* 154 B.R. 21, 28 (S.D.N.Y.1993) (consequential damages that arose as a consequence of the breach by subjecting the non-breaching party to defend a law suit plus interest and taxes were recoverable in addition to the liquidated damages for the breach of contract for selling real estate). If Entergy can show that it incurred consequential damages which were not part of the cost of obtaining alternate fuel supplies, Entergy may be able to seek actual damages for these amounts.[10]

Having determined that the liquidated damages clause does not provide Entergy's exclusive remedy, UP's motion for summary judgment is denied to the extent that it seeks to dismiss the case. However, as discussed above, Entergy is precluded from seeking actual damages directly relating to the cost of obtaining alternate fuel supplies. Accordingly,

IT IS ORDERED:

1) Plaintiff's motion for partial summary judgment (Filing No. 76) is granted as to plaintiff's claim that UP breached the interim agreement by failing to transport all coal tendered by plaintiff, therefore creating deficits and in failing to make up deficit tonnage within the succeeding calendar quarter. In all other respects, said motion is denied.

9. Entergy claims that liquidated damages would amount to only $3.7 million when the actual cost of replacing lost coal-fired generation with alternate generation using other fuels would be $30 million (Jewell Affidavit dated Sept. 28, 1998 ¶ 13). In a footnote, Entergy mentions that liquidated damages which are too low in comparison with the reasonably anticipated actual damages are held void if they are unconscionable. (Entergy Memorandum in Opposition to UP's Motion for Summary Judgment at 11 n. 3) (citing Restatement (Second) Contracts § 347, cmt. a). In the event Entergy's footnote can be construed as a point of law upon which Entergy wishes the

court to make a ruling, the court lacks sufficient evidence of undisputed facts to make such a determination.

10. Entergy also contends that the liquidated damages provision does not cover actual damages for UP's breach of its duty of good faith. If it is later determined that UP had a duty of good faith which it breached, Entergy may be able to pursue actual damages resulting from a breach of good faith as long as the damages do not directly relate to the costs of obtaining alternate fuel supplies.

2) Defendant's motion for summary judgment (Filing No. 74) is denied.

3) The parties shall advise the Court, in writing, on or before February 22, 1999, whether or not they are ready for the status conference provided in Paragraph 4 of the order of the magistrate judge filed March 17, 1998.