CRYSTAL OIL COMPANY and Nevada Oil Company *v.* Donald L. WARMACK

92-1102                                              855 S.W.2d 299

Supreme Court of Arkansas
Opinion delivered June 7, 1993
[Rehearing denied July 12, 1993.]

*Smith, Stroud, McClerkin, Dunn & Nutter*, by: *Hayes C. McClerkin* and *Barry A. Bryant*, for appellant Crystal Oil Co.

*James B. Bennett*, for appellant Nevada Oil Co.

*Keith, Clegg & Eckert*, by: *Oliver M. Clegg* and *Carolyn J. Clegg*, for appellee.

DAVID NEWBERN, Justice. This is an accounting case involving oil and gas leases. The appellee, Donald L. Warmack, sued the appellants, Crystal Oil Company (Crystal) and Nevada Oil Operators (Nevada), claiming he, instead of they, should have been paid royalties on a mineral leasehold. His claim was based on the allegation that the 1963 lease, under which Crystal and Nevada claimed the royalties, had expired because of breach of the implied covenant to develop, thus activating his 1979 "top lease" prior to the payment of the royalties which occurred sometime after 1985.

Crystal and Nevada disputed the allegation that the 1963 lease, which formed the basis of the payments to them, had expired. They also contended Warmack was, because of laches, estoppel, and ratification of the 1963 lease, barred from asserting whatever right he might have. We agree with the Trial Court that the 1963 lease had expired prior to the payment of the royalties and that Warmack's claim was not barred by laches, estoppel, or ratification.

The 1963 mineral rights lease covered 200 acres. Shortly after the lease was granted, 80 of the 200 acres were placed in a unitized field. We need not recite all the transactions which resulted in Crystal's and Nevada's claims. It is enough to say that each of them was an assignee of the 1963 lease, and each reserved an overriding royalty interest when the lease was further assigned. In 1979 Warmack, took a "top lease" from the grantor of the 1963 lease of the 120 acres remaining outside the unit. A "top lease," according to H. Williams and C. Meyers, *Oil and Gas Terms*, (7th ed. 1987), p. 1011, is "A lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated."

There was no exploratory or other drilling or testing on the 200 acres by any lessee or leasehold assignee from 1963 until 1985 with the exception that in 1979 Warmack re-entered a well he had drilled in 1955 on the 120 acres. Only minimal production

occurred from that well, about a barrel and a half a day.

In 1985, the Tullos Group acquired, by assignment, rights under the 1963 lease as well as under Warmack's top lease and began exploratory drilling on the 120 acres Warmack had top leased. Royalties were paid to Crystal and Nevada, and in 1989 Warmack asserted his claim to the royalties.

Crystal's abstract of the record, on which both Crystal and Nevada rely, with minor additions by Nevada, tells us hardly anything about the 1963 lease. All we know from the abstract is that the 1963 lease is an "Oil and Gas Lease," the names of the parties, and the description of the land covered. Nothing is stated about the terms of the lease, such as its duration or whether there is any provision which would determine the effect of unitization of the 80 acres on the matter of whether there was sufficient development to avoid breach of the implied covenant to develop the remaining 120 acres.

Although it is just barely so, the abstract is sufficient to allow us to consider the issue of the breach of the implied covenant to develop. Absent a provision to the contrary, there is such an implied covenant in any "oil and gas lease." *See Enstar Corp.* v. *Crystal Oil Co.*, 294 Ark. 77, 240 S.W.2d 630 (1987), where we quoted the following from *Byrd* v. *Bradham*, 280 Ark. 11, 655 S.W.2d 366 (1983):

> In oil and gas leases where royalties constitute the chief consideration, an implied covenant exists that the lessee will explore and develop the property with reasonable diligence. (Citation omitted.) The duty to explore extends to the entire tract, and this is especially true where paying quantities of oil have been found on a part of the tract. (Citation omitted.)
>
> Of course, due deference must be given to the judgment of the lessee in determining whether to drill, but the lessee must not act arbitrarily. (Citation omitted.) Furthermore, the lessee must act not only for his own benefit but also for the benefit of the lessor. (Citation omitted.) The lessee's obligation to explore is a continuing one, even after paying quantities of oil are discovered, in order to effect the purpose of the lease. (Citation omitted.) Produc-

tion on only a small portion of the leased land does not justify allowing the lessees to hold the entire leasehold indefinitely, thus depriving the lessor of receiving royalties from another arrangement. (Citation omitted.)

Nevada acknowledges the ruling in *Byrd* v. *Bradham, supra,* that it was insufficient to explore five acres of an 80-acre tract and thus the leases in that case were canceled. It argues, however, "Here we have a substantial portion of the leased acreage, 80 of 200 acres, continuously producing since they were placed in the Irma Unit in approximately 1964. In Appellant's view this production and respective royalties paid to lessor held the 1963 lease." There are two problems with the argument. First, the only inkling we have from the abstract that the 80 acres in the unit were "continuously producing" is a reference by Mr. Corley to the receipt by Nevada of some royalties from the unit. Second, no authority is cited in support of the conclusion that unitization of two-fifths of a leasehold interest is sufficient to hold the remaining three-fifths. We acknowledge *Bibler Bros. Timber Corp.* v. *Tojac Minerals,* 281 Ark. 431, 664 S.W.2d 472 (1984), a case not cited by the parties, which seems to support this argument. By way of an *obiter dictum* we stated:

> The general rule is that an oil, gas and mineral lease is indivisible. Production in any part of the lease keeps the lease in effect for as long as oil, gas and other minerals are being produced on any of the lands described in the instrument. The standard lease with a pooling clause provides that the entire lease will be considered held by production, whether that production is on the pooled area or some area of the tract that has not been unitized.

That case, however, in which we went on to describe the "Pugh clause" and its effect, turned on the language of the lease, be it a "standard" or other type. Here we are limited by not having the language of the lease included in the abstract and must consider the effect of the implied covenant to develop the leasehold without the benefit of any lease provisions which might affect it.

We note that Act 380 of 1983 [Ark. Code Ann. § 15-73-201(a) (1987)] provides that "The term of an oil and gas or oil or gas lease extended by production in quantities in lands in one

(1) section or pooling unit in which there is production shall not be extended in lands in sections or pooling units under the lease where there has been no production or exploration." The statute, while it cannot be applied to a lease entered some 20 years prior to its enactment, makes good sense. If it were not so, a lessee could, as in this case, attempt to tie up the majority of a leasehold by some production or pooling on the minor part.

Of course, in some instances it might make sense to allow it. For example, if the production on one small part of the leasehold is shown to be draining the entire leased area. In that respect this case stands in stark contrast to *Stephenson* v. *Barnes*, 288 Ark. 147, 702 S.W.2d 787 (1986), where there was evidence presented by the lessee that he had drilled several wells and obtained geological data showing that further drilling elsewhere on the leasehold would be harmful to the production he was eking out on the small area he had explored. We wrote:

> Here, by contrast, the lessee of 120 acres has drilled five wells in the most promising part of the lease, with good production from two of them, and has shown why he would be unduly harmed by cancellation. He has also developed the leasehold systematically and proceeded in every direction as far as is reasonably practical. We are convinced that his actions have complied with the implied covenant to develop the leasehold at the Nacatoch level.

There is no similar evidence in this case; no showing that any exploration whatever occurred prior to 1985. Crystal and Nevada presented two witnesses, one of whom, Mr. Corley, is affiliated with Nevada and the other, Mr. Wright, is the Director of the Arkansas Oil and Gas Commission. Both testified essentially, but without saying specifically why, that the exploration done in and after 1985 by the Tullos Group was not "prudent," the implication being that there was no breach of the implied covenant to develop the land because it would have been "imprudent" for the 1963 lessees and their successors to have developed the leasehold.

Mr. Corley testified that he had no intention of drilling on the 120 acre tract as he had better places to drill. Surely such a lessee may not tie forever the hands of the owner. The 22 years of inactivity on the 120 acre tract violated the implied covenant to develop, and the chancellor was correct to regard the 1963 lease

as a nullity.

## 2. Laches, estoppel, and ratification

Crystal and Nevada assert that Warmack is barred by laches, estoppel, and ratification because (1) he took no action to develop the 120 acres until 1985 when he farmed his interest out to the Tullos Group, (2) he signed a 1985 division order acknowledging the interests of Crystal and Nevada, and (3) he accepted an interest in the 1963 lease when he entered negotiations with some parties claiming interests under the 1963 lease and accepted those interests as consideration for settlement of a dispute.

We have no quarrel with the citation of *Pope* v. *Pennzoil Producing Co.*, 288 Ark. 10, 701 S.W.2d 366 (1986), for the proposition that oil and gas properties are unusual and require diligence on the part of interested parties. Laches, however, requires a showing of some sort that the party asserting the doctrine has suffered or changed its position as a result of the lack of diligence or delay in assertion of rights. *Gordon* v. *Wellman*, 265 Ark. 914, 582 S.W.2d 22 (1979). The same is true of estoppel; there must be some showing of reliance. *Hope Education Ass'n* v. *Hope School Dist.*, 310 Ark. 768, 839 S.W.2d 526 (1992). There was no showing of reliance or change of position by Crystal or Nevada.

We agree with Warmack's position that he clearly is not claiming under the 1963 lease, but under his 1979 top lease. Thus, he is not, as Crystal and Nevada would have us conclude, placing any reliance on the 1963 lease, in which he may have accepted an interest in a settlement.

We cannot consider the argument about the division order allegedly signed by Warmack as it does not appear in the abstract. Not all division orders are alike, *see, Anadarko Petroleum Co.* v. *Venable*, 312 Ark. 330, 850 S.W.2d 302 (1993), and *Pope* v. *Pennzoil Producing Co, supra*, and we have no idea, based on the record in this case, what was contained in the one alluded to here.

This case has been very difficult for every member of the Court to understand. Not only is the appellant's abstract almost fatally deficient, but a good deal of extrapolation on our

part was required to understand the arguments enough to perceive the merits of this case. While we recognize that it is impossible to avoid some usage of legal jargon, we take this opportunity to ask and suggest that, particularly in specialized cases such as those dealing with oil and gas and mineral rights, members of the bar attempt to avoid legal jargon where regular words would do. We also hope cryptic argument in these cases may become a thing of the past and that more care will be taken to explain and to present the record by abstract in a more complete manner.

Affirmed.