Mike DAVIS *v.* ROSS PRODUCTION COMPANY

95-479                                    910 S.W.2d 209

Supreme Court of Arkansas
Opinion delivered November 20, 1995

*Smith, Stroud, McClerkin, Dunn & Nutter*, by: *Charles A. Morgan*, for appellant.

*Crumpler, O'Connor & Wynne*, by: *William J. Wynne*, for appellee.

TOM GLAZE, Justice. This case involves partial cancellation of an oil and gas lease. On January 20, 1979, Butler-Johnson, Inc., obtained oil and gas leases in lands located in Miller County and described as follows:

Township 17 South, Range 28 West

Section 24:

The East Half of the Southeast Quarter (E 1/2 SE 14) and
the Southeast Quarter of the Northeast Quarter (SE 1/4 NE
1/4) and comprising in the aggregate 120 acres, more or
less[.]

The lands described above are known as the Fouke B Lease and
are comprised of three quarter-quarter sections of forty acres
each. Subsequently, Butler-Johnson assigned its interest in the
Fouke B Lease to appellee Ross Production Company. Addi-
tionally, Ross Production acquired leases in contiguous lands
known as the Fouke Estate Lease. Together, the Fouke Estate
Lease and the Fouke B Lease comprised 600 acres of Section
24.[1] The oil and gas in the lands covered by the Fouke Estate
Lease and the Fouke B Lease are owned by the same lessors
whose respective undivided interests are the same proportions
throughout the entire leased premises. However, only the Fouke
B Lease is at issue here.

Subsequent to obtaining the assignment, Ross Production
drilled three wells under the Fouke B Lease on each of the three
governmental quarter-quarter sections. In April 1982, Ross Pro-
duction drilled the B-1 well in the southeast quarter of the south-
east quarter (SE 1/4 SE 1/4). Because the well was not com-
mercially productive, the B-1 well was plugged and abandoned
that same month as required by the Arkansas Oil & Gas Com-
mission. On November 13, 1982, Ross Production completed the
B-2 well which was a commercial producer of oil and which con-
tinues to produce. The B-2 well is located in the northeast quar-
ter of the southeast quarter (NE 1/4 SE 1/4), and drains the Paluxy
Formation. Lastly, Ross drilled the B-3 well in the Southeast
quarter of the northeast quarter (SE 1/4 NE 1/4). This third well
was not commercially productive and was abandoned in Decem-
ber 1984. Following the completion of the producing B-2 well
in 1982, Ross Production applied to the Commission pursuant
to regulations for the establishment of field rules applicable to

[1]The only portion of Section 24 which Ross Production did not obtain is a forty-
acre unit located in the northeast quarter of the northeast quarter (NE 1/4 NE 1/4).

the Paluxy Formation. After a public hearing on August 24, 1982, the rules promulgated provided that areas contiguous with the south half of Section 24 overlying the Paluxy Formation are designated as the Boggy Creek Field, and established that forty-acre drilling units be comprised of governmental quarter-quarter sections for wells completed within the Paluxy Formation. Further, the rules provided that wells be located at no less than 280 feet from the boundary lines of each unit.

Ross Production drilled a total of twelve wells within the Boggy Creek Field. Eight of the twelve wells were on lands held under both the Fouke Estate Lease and the Fouke B Lease. Five of those were dry wells and the remaining three were completed as commercially productive. After the B-3 well was plugged and abandoned on December 6, 1984, Ross Production did no further drilling or exploration on those three forty-acre units of Section 24 under the Fouke B Lease.

In October of 1992, appellant Mike Davis acquired top leases[2] on the southeast quarter of the southeast quarter of Section 24 (SE 1/4 SE 1/4). This is the same forty-acre unit under the Fouke B Lease in which Ross Production drilled and abandoned the B-1 well in April 1982. This unit, hereinafter described as the B-1 unit, is included in the Boggy Creek Field.

By letter dated January 18, 1994, Ross Production demanded Davis release his 1992 top leases. In response, Davis demanded Ross Production release the B-1 unit from the 1979 Fouke B Lease, based on Ross Production holding the B-1 unit for eleven years without further development and production. On May 12, 1994, Ross Production and Davis filed separate applications with the Commission for authority to drill a well at the same location on the B-1 unit. That proposed drilling location is as close as the field rules allow to the B-2 well and the Fouke Estate No. 2 well, both of which are producing. If drilled as proposed, the new well would be located 560 feet from each of two producing wells owned by Ross Production. The Commission denied both

---

[2]A top lease is a lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated. *Crystal Oil Co.* v. *Warmack*, 313 Ark. 381, 383, 855 S.W.2d 299, 301 (1993) (citing Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 1011 (7th ed. 1987).

requests pending a legal determination of which party had the right to drill and develop the B-1 unit.

On May 2, Ross Production filed a petition to remove the cloud on its leasehold and quiet title under the 1979 Fouke B Lease on behalf of itself and other owners of working interests in the Fouke B Lease, and to cancel Davis's top leases on the B-1 unit. Davis answered pleading the affirmative defense of breach of covenants under the original oil and gas leases. Davis counterclaimed seeking cancellation of that portion of the 1979 Fouke B Lease on the B-1 unit, and requested quiet title in him through his top leases for the B-1 unit. Other procedural orders were entered which are not at issue here.

Following trial on the merits, the chancellor held as a matter of law the following:

> The fact that [Ross Production] did not additionally explore or develop the [B-1 unit] for the twelve year period that commenced with the plugging and abandonment of the Fouke Estate B-1 well (April 1982) is not legally significant.

The chancellor found Ross Production began to explore or develop the B-1 unit only when it learned Davis had obtained top leases on the B-1 unit, and was prepared to submit to the Commission a request for permission to drill. Nonetheless, the chancellor concluded that Ross Production held the Fouke B Lease by having drilled a well on each of the three units under the lease. The chancellor also held Ross Production did not have a continuing duty to further develop the B-1 unit from April 1982 through to the present. Lastly, the chancellor held as follows:

> This court on the record before it does not find that the act of [Ross Production] in deferring drilling operations until such time as the price of crude oil would increase for the benefit of both the lessors and the lessee particularly when the minerals were owned in the same proportions by the owners under the entire leased premises and that not even the slightest indication has been made that drainage has occurred or that the lessors have sustained any economic loss except for the fact that a successful well within the [B-1 unit] would have returned royalties to the mineral owners more quickly or at an earlier date.

In so holding, the chancellor quieted title to the leasehold on the B-1 unit in Ross Production, canceled Davis's top leases to the B-1 unit, and dismissed Davis's counterclaim with prejudice.

Davis raises the following points for reversal: (1) the chancellor erred in holding that Ross Production's failure to develop the B-1 unit for twelve years was legally insignificant; (2) the chancellor erred in holding that Ross Production had no duty to further develop the B-1 unit from April 1982 to January 1995; and (3) the chancellor erred in finding that the lessors suffered no economic loss from Ross Production's inactivity. Davis argues the foregoing findings were clearly erroneous and therefore the chancellor was wrong in cancelling his top leases and dismissing his counterclaim. Because we find Davis's arguments have merit, we reverse and remand.

Because Davis's first two points are so interrelated, we discuss them together. Davis contends Ross Production had a continuing duty to develop the B-1 unit for the benefit of the royalty owners, and the fact both he and Ross applied for a drilling permit at the same time is evidence that a reasonably prudent operator would have drilled in the B-1 unit earlier. Furthermore, Davis argues Ross Production could not hold the Fouke B Lease on the entire 120 acres by producing only on one forty-acre unit. Davis points out Ross has conducted no exploration or development under either the Fouke Estate or Fouke B leases since December 6, 1984. On the other hand, Ross Production concedes it has performed no drilling activities on the 120 acres under the Fouke B Lease since 1984, but argues its failure to do so was due to the depressed oil market. Ross also notes the considerable amount of money it has expended in exploring and developing the Boggy Creek Field, and contends cancellation of the lease as to the B-1 unit would cause it irreparable injury and deprive it of "a vested leasehold interest." Additionally, Ross points out the lessors of the B-1 unit are the same lessors of the remainder of the Fouke B and the Fouke Estate leases, and they have accepted the royalties under those leases without demanding the B-1 unit be further developed. Nor, Ross asserts, was there any evidence of drainage of oil from the B-1 unit. Finally, Ross contends it complied with the implied covenant to develop by drilling a well in each of the three forty-acre units, and due deference must be given its judgment as lessee. In reply, Davis

notes that while Ross Production claims to have spent over $1 million on the Boggy Creek Field, only $372,472 was spent on the 120 acres under the Fouke B Lease, and none has been spent since 1984. According to the evidence, Davis points out only $101,129 has been spent on the B-1 unit since 1982.

The parties generally agree that the lessee has the duty to develop the entire leasehold and must do so with reasonable diligence. However, the parties do dispute the application of those principles to the facts of this case. Michael Davis testified he based his decision to obtain his leases on the B-1 unit and drill the proposed site after studying Ross Production's own electric well logs, as well as those of other operators in the area, all of which are public records filed with the Commission. Davis also testified he considered the B-1 unit abandoned by Ross.

Ross Production's own geological expert and business partner, Joseph Laird, testified that the geologic evidence had not changed since 1984, and he had recommended that Ross redrill the B-1 unit after the B-1 well was capped in 1982. Further, Laird testified that the proposed well will be separated from the producing B-2 well by a fault which will prevent the proposed well from draining the same reservoir as the B-2 well. Laird agreed with Davis's assessment that the proposed well will probably produce commercial hydrocarbons. Finally, Laird testified they had known about the proposed well location since 1984, and nothing had prevented them from drilling a well there.

While Ross Production argues its decision not to drill the well from 1984 to the present was justified by the depressed oil market, Davis contends that, except for a period during the Persian Gulf War when the price of oil was at a high of $30 a barrel, the average price of oil over the twelve year period was $15 a barrel with a low of $12. Most significant on this point, however, is the cross-rebuttal testimony of Albert Ross, a partner in Ross Production. For example, Ross repeatedly admitted that Ross Production had not drilled on the B-1 unit since 1982, because they were waiting for the price of oil to increase. Ross further testified that even though the price of oil was now lower than it had been at times in the past, it still was economically advantageous to drill the proposed well. Finally, Ross was asked why Ross Production failed to drill in the B-1 unit since 1984, and he explained as follows:

Q    It was economically feasible for you to drill this well in the preceding, any time during the preceding ten years?

[Ross] Yes, but, we were hoping that the price would go up so it would be more economically advantageous to both us and the royalty owners.

■■ In *Standard Oil Co. of La.* v. *Giller*, 183 Ark. 776, 38 S.W.2d 766 (1931), this court held as follows:

[I]n any oil and gas lease in which royalties constitute the chief consideration, an implied covenant exists on the part of the lessee to explore the property with reasonable diligence, so as to produce oil and gas in paying quantities upon the entire tract. Especially is this true after either or both commodities has or have been discovered on any part of the tract.

*Id.* at 777. *See also Byrd* v. *Bradham*, 280 Ark. 11, 655 S.W.2d 366 (1983) (production on only a small portion of the leased land does not justify allowing the lessees to hold the entire leasehold indefinitely). While due deference should be given to the judgment of the lessee as operator to determine how many wells should be drilled, the lessee must use sound judgment, and promote and protect the interests of both himself and the lessor. *Giller* at 777.

■ We also note that in *Ezzell* v. *Oil Associates, Inc.*, 180 Ark. 802, 22 S.W.2d 1015 (1930), this court stated in dicta the following:

It is true that the drilling of oil wells is very costly, but the parties understood this when they executed the lease. The lessee only agreed to pay the lessors one-eighth of the oil produced as rent, and reserved seven-eighths of it for its own profit in drilling the well, and in undertaking the risk of not finding any oil.

*Id.* at 812. The lessee has a duty to produce throughout the whole of the leased premises, and the lessee must not consider his own interests wholly or for the most part. *Poindexter* v. *Lion Oil Refining Co.*, 205 Ark. 978, 167 S.W.2d 492 (1943).

Furthermore, we recently decided the case of *Sunbelt Explo-*

*ration Co.* v. *Stephens Prod. Co.*, 320 Ark. 298, 896 S.W.2d 867 (1995), which involved an action to cancel underlying leases in favor of top leases. There, Sunbelt argued in part that Stephens breached its duty to further develop a gas reservoir which was divided by a fault. In rejecting Sunbelt's arguments and holding cancellation was not appropriate, we noted the undisputed testimony showed the technology was not available until 1990 to determine that a fault existed dividing the gas reservoir which prevented production from the entire reservoir, and Stephens began plans to develop the lower portion of the reservoir as soon as the fault was discovered.

■ While recognizing the lessee-operator is interested in obtaining the greatest profits possible, this court has held that the oil and gas lease is not executed for speculative purposes, but for present benefits or for benefits to be obtained within a reasonable time. *Mansfield Gas Co.* v. *Alexander*, 97 Ark. 167, 133 S.W. 837 (1911). If the lessee-operator contends there is nothing to be gained by continued development, the lessee has lost nothing by cancellation of the nonproducing portion of the lease. *Byrd* v. *Bradham*, 280 Ark. 11, 655 S.W.2d 366 (1983); *Skelly Oil Co.* v. *Scoggins*, 231 Ark. 357, 329 S.W.2d 424 (1959).

Each oil and gas case is, more often than not, distinguishable upon its own facts. Based on the facts presented here, Ross Production knew that the isolated reservoir existed in the B-1 unit as early as 1984, and that the B-2 well was not producing from that reservoir. Ross Production's own geologist recommended redrilling the B-1 unit in 1982. Further, Ross Production's own evidence shows the price of oil had remained fairly stable during the eleven-year period, except for two periods, during 1985 and during the Persian Gulf War in 1990, when the barrel price rose to $25 and above. Despite the relatively stable oil prices over the years, Ross Production did not become interested in further developing the B-1 unit until it discovered Davis had filed his top leases.

■ In considering Ross Production's own testimony and evidence as set out hereinabove, we cannot say that its actions were those of a prudent operator who exercised reasonable diligence in exploring and developing the entire leasehold. Therefore, the chancellor's holding that Ross Production's inactivity

was legally insignificant and that it had no duty to further develop the B-1 unit was clearly erroneous.

We turn next to Davis's argument that the trial court erred in finding that Ross Production's act of deferring drilling operations did not result in economic loss to the lessors. In support of his argument, Davis states that Ross Production's delay of twelve years in developing the B-1 unit resulted in a loss of royalties from a producing well and prevented the lessors from making other arrangements for development. *See also* Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 834 (1987) (while usually inadequate, the lessor's damages may be based either on the royalty income lost from the time a well should have been drilled, or on the interest on the sum that would have been paid if no breach had occurred). Davis also notes that under the Fouke B Lease with Ross Production, the royalty owners receive 1/8 of the oil produced as rental, whereas with him, the royalty owners could receive 3/16. On the other hand, Ross Production avers the owners received their royalty interest from the producing B-2 well over the years.

As Davis notes, in *Nolan* v. *Thomas*, 228 Ark. 572, 309 S.W.2d 727 (1958), this court stated the production of oil on a small portion of the lease tract cannot justify the lessee's holding the balance indefinitely and depriving the lessor, not only of the expected royalty from production, but of the privilege of making some other arrangement. *See also Enstar Corp.* v. *Crystal Oil Co.*, 294 Ark. 77, 740 S.W.2d 630 (1987); *Skelly Oil Co.* v. *Scoggins*, 231 Ark. 357, 329 S.W.2d 424 (1959). Since 1984, when further development under the Fouke B Lease ceased, the royalty owners lost income which could have been earned from redrilling the B-1 unit. For these reasons, we must hold that the chancellor was also clearly erroneous in finding that the royalty owners have not sustained losses.

In conclusion, we mention Davis's suggestion that this court establish, as a matter of law, a specific, maximum time period of inactivity after which an oil and gas lease would be subject to cancellation for failure to drill and develop the leasehold. Davis cites Ark. Code Ann. § 15-73-201 (Repl. 1994) wherein the General Assembly has provided that one year beyond the primary term of the lease or one year within completion of

a well is a maximum time the lessee can hold by production, lands outside a unit or pool in which there has been no production or exploration.[3] Davis suggests this court adopt a period of ten years, rather than one year, as a matter of public policy. We choose not to do as Davis requests. As we have stated many times, it is for the General Assembly, not the courts, to establish public policy. *Nabholz Construction Corp.* v. *Graham*, 319 Ark. 396, 892 S.W.2d 456 (1995).

■ On appeal, we review chancery cases *de novo* and will reverse the findings of the chancellor only if those findings are clearly erroneous. *Sunbelt Exploration Co.* v. *Stephens Production Co.*, 320 Ark. 298, 896 S.W.2d 867 (1995). Here, as more fully discussed above, the chancellor was clearly wrong (1) in holding Ross Production's inactivity on the B-1 unit was legally insignificant, (2) in deciding Ross Production had no duty to further develop the B-1 unit, and (3) in finding the royalty owners suffered no loss as a result. Because we find Ross Production breached the implied convent to continue to explore and develop the B-1 unit, we reverse and remand with orders to cancel the Fouke B Lease with Ross Production only as to the forty acre SE 1/4 SE 1/4 unit, and to quiet title to the same in Davis.

JESSON, C.J., not participating.

---

[3]Because the Fouke B Lease was entered into in 1979, before the effective date of the statute, this statute is not controlling in this case. *See* § 15-73-201(c).