2010 Ark. 276

Danny SNOWDEN and Shelia
Snowden, Appellants,

v.

JRE INVESTMENTS, INC., Chesapeake
Exploration, LLC, Chesapeake Explo-
ration Limited Partnership, and Ches-
apeake Energy Corporation, Appel-
lees.

No. 09–1149.

Supreme Court of Arkansas.

June 3, 2010.

M. Edward Morgan, Clinton, and J. Cody Hiland, Conway, for appellants.

Michelle Cullen, Oklahoma City, OK, and Daily & Woods, PLLC, by: Jerry L. Canfield, Fort Smith, for appellees.

JIM GUNTER, Justice.

This appeal involves an oil and gas lease that extends by production. Chesapeake Exploration, LLC; Chesapeake Exploration, Limited Partnership; and Chesapeake Energy Corp. (collectively hereinafter referred to as "Chesapeake"), as lessee, maintains that its lease with Shelia and Danny Snowden was extended pursuant to the terms of the lease itself and by the application of Ark.Code Ann. § 15–73–201 (Repl.2009). This issue was fully briefed in cross-motions for summary judgment and each side was presented at a hearing before the circuit judge. The circuit court ruled in Chesapeake's favor, and the Snowdens now appeal that decision. In addition, Chesapeake cross-appeals the circuit court's order denying it certain equitable relief. We assumed jurisdiction of this case pursuant to our authority in Rule 1–2(b)(1) and (6) of the Arkansas Rules of the Supreme Court to reassign any case involving an issue of first impression and a substantial question concerning the validity, construction, or interpretation of an act of the General Assembly.

On appeal, the Snowdens assert the following: (1) that the circuit court erred in interpreting Ark.Code Ann. § 15–73–201 as extending the term of the lease to all lands under the lease rather than just to the producing section of land; (2) that the statute should be interpreted so that all its terms are given effect; and (3) that if determined to be ambiguous, this court should construe the statute in accordance with legislative intent. On cross-appeal, Chesapeake maintains that the circuit court erred in not suspending its drilling obligations under the lease while the litigation was ongoing. We affirm the circuit court's decision on direct appeal, and we reverse its decision on cross-appeal.

On May 19, 2008, Shelia and Danny Snowden, as husband and wife, filed a complaint in Faulkner County Circuit Court against JRE Investments, Inc., and Chesapeake. The Snowdens owned mineral interests in approximately 1250 acres of land located in Faulkner County that they had leased to JRE by agreement on February 11, 2005, for three years. The lease contained an extension provision stating that the lease "shall remain in force for a primary term of three (3) years and as long thereafter as oil, gas or other hydrocarbons are produced from said leased premises or from lands pooled therewith." A separate provision provided:

> Notwithstanding anything contained in this Lease to the contrary, it is expressly agreed that if the Lessee shall commence operations as provided herein at any time while this Lease is in force, this Lease shall remain in force and its terms shall continue so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained.

The lease also provided a definition for the term "operations" that included, but was not limited to,

> [c]ommencing, construction of roadways, preparation of drillsite, drilling, testing, completing, recompleting, deepening, plugging back[,] repressuring[,] pressuring[,] maintenance, cycling, secondary recovery operations, or the production of oil or gas, or the existence of a shut-in well capable of producing oil or gas.

The lease was assigned to Chesapeake on September 16, 2005. On February 2, 2008, during the primary term of the lease, Chesapeake commenced drilling the "Jimmy Roberts" 8–13 1–29H well in Section 29 of Township 8 North, Range 13 West, Faulkner County on the Snowdens' property. Section 29 included approximately 158 acres of the land owned by the Snow-

dens. On February 13, 2008, Chesapeake filed an Affidavit of Drilling Operations and Lease Extension, noting that drilling had commenced in Section 29, which extended the lease as to all lands pursuant to the lease terms and Ark.Code Ann. § 15–73–201. The Jimmy Roberts 8–13 1–29H well was completed on March 29, 2008. Two additional "Jimmy Roberts" wells in Section 29 were drilled subsequent to the completion of the first well, the last of which was completed on September 9, 2008.

In their complaint, the Snowdens alleged that Chesapeake had violated Ark.Code Ann. § 15–73–204 by failing to release all sections of property except for the section containing the Jimmy Roberts well; that Chesapeake had violated Ark.Code Ann. § 5–37–226(a) by filing an Affidavit of Drilling Operations and Lease Extension clouding the Snowdens' title; and that Chesapeake had violated the "depth clause" provision contained in the lease. The Snowdens requested that the circuit court nullify the Affidavit of Drilling Operations and Lease Extension; that Chesapeake be ordered to pay double the damages the Snowdens sustained by the cloud on their title; that Chesapeake be ordered to pay treble and punitive damages pursuant to Ark.Code Ann. § 5–37–226(c); and that Chesapeake release all mineral interests below the depth of 100 feet under the stratigraphic equivalent of the deepest depth of all wells drilled.

Chesapeake filed an answer on June 16, 2008, denying all material allegations in the complaint. It asserted a counterclaim asking the circuit court for a declaratory judgment that by commencing the drilling of the Jimmy Roberts well within the primary term of the lease agreement, it had complied with the terms of the lease agreement. Furthermore, Chesapeake maintained that it was entitled to a declar-

atory judgment suspending its drilling operations during the pendency of the lawsuit.

On January 5, 2009, Chesapeake filed a motion for summary judgment, asserting that it was entitled to judgment as a matter of law based on the terms of the lease agreement and § 15–73–201.[1] Chesapeake further requested a suspension of its drilling obligation during the pendency of the lawsuit. The Snowdens filed a cross-motion for summary judgment on February 13, 2009, asserting that they were entitled to judgment as a matter of law on the issue of liability.

A hearing on the summary-judgment motions was held March 2, 2009. On July 20, 2009, the circuit court issued a final decree in the case. The court found that Ark.Code Ann. § 15–73–201 was not ambiguous; that the lease agreement between the Snowdens and JRE, which had been subsequently assigned to Chesapeake, was valid; that Chesapeake commenced drilling within Section 29 of the leased land within the primary term of the lease; that Chesapeake completed the Jimmy Roberts well in Section 29 on August 23, 2008, so that pursuant to Ark. Code Ann. § 15–73–201, the lease continued to be in effect as to all sections for one year subsequent to August 23, 2008; and that the Snowdens were not entitled to relief based on the "depth clause" referred to in the lease.[2] The court found that § 15–73–201(b) required a lessee to drill at least one well per year to avoid the effect of subsection (a). The court denied with prejudice the Snowdens request to nullify the lease and granted Chesapeake's summary-judgment motion. However, the circuit court denied Chesapeake's request for equitable relief as to suspending its drilling obligations during the pendency of the lawsuit. The Snowdens filed a timely notice of appeal from the order on July 30, 2009, and Chesapeake filed a timely notice of cross-appeal on August 19, 2009.

■ This case presents an issue of statutory interpretation within the context of a grant of summary judgment. This court has repeatedly held that summary judgment, although no longer viewed as a drastic remedy, is to be granted only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Monday v. Canal Ins. Co.*, 348 Ark. 435, 73 S.W.3d 594 (2002). In this case, the parties filed cross-motions for summary judgment and did not dispute the facts. As such, the case was decided purely as a matter of statutory interpretation.

■ We review issues of statutory interpretation de novo, as it is for this court to decide what a statute means. *Fewell v. Pickens*, 346 Ark. 246, 57 S.W.3d 144 (2001). In this respect, we are not bound by the trial court's decision; however, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. *Harris v. City of Little Rock*, 344 Ark. 95, 40 S.W.3d 214 (2001). The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Raley v. Wagner*, 346 Ark. 234, 57 S.W.3d 683 (2001). When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *Stephens v. Ark. Sch. for the Blind*, 341

---

1. JRE adopted the arguments of Chesapeake.

2. Although the trial court referred to August 23, 2008, as the date of the completion of the last well, we note that Chesapeake provided undisputed evidence that the last well on Section 29 was completed on September 9, 2008.

Ark. 939, 20 S.W.3d 397 (2000). When the meaning is not clear, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. *Id.* The basic rule of statutory construction is to give effect to the intent of the General Assembly. *Ford v. Keith,* 338 Ark. 487, 996 S.W.2d 20 (1999).

Although organized as multiple points on appeal, the Snowdens' argument is whether the circuit court erred in interpreting Ark.Code Ann. § 15–73–201 to grant summary judgment in favor of Chesapeake. The statute in question provides the following:

> (a) The term of an oil and gas, or oil or gas, lease extended by production in quantities |₇in lands in one (1) section or pooling unit in which there is production shall not be extended in lands in sections or pooling units under the lease where there has been no production or exploration.
>
> (b) This section shall not apply when drilling operations have commenced on any part of lands in sections or pooling units under the lease within one (1) year after the expiration of the primary term, or within one (1) year after the completion of a well on any part of lands in sections or pooling units under the lease.
>
> (c) The provisions of this section shall apply to all oil and gas, or oil or gas, leases entered into on and after July 4, 1983.

The Snowdens agree with the circuit court that the statute is clear and unambiguous but assert that the circuit court's interpretation of it fails to conform to the principles of interpretation and is contrary to common-law principles regarding an implied covenant to develop. The Snowdens claim that reading subsections (a) and (b)

together and in harmony with common-law principles requires a determination that production or drilling in one particular section or pooling unit within one year of the expiration of the primary term extends the lease only as to that particular section or pooling unit, not to all lands leased where production or drilling has not occurred. Because Chesapeake had only drilled in Section 29 as of the date of the summary-judgment hearing, the Snowdens maintain that the lease was extended as to that section only and that the lease has expired as to all other acreage. They cite *Crystal Oil Co. v. Warmack,* 313 Ark. 381, 855 S.W.2d 299 (1993), as support.

In response, Chesapeake contends that the language of the lease itself supports extension as long as there is production; that the statutory language is clear and unambiguous; that the circuit court correctly interpreted Ark.Code Ann. § 15–73–201 to extend the lease to all lands under the undisputed facts; and that the Snowdens did not claim a breach of the common-law principle of implied covenant to develop to this case.

|₈This court has not yet had an opportunity to interpret Ark.Code Ann. § 15–73–201. In *Crystal Oil Co.,* we recognized the passage of the statutory provision, but noted that the lease at issue was entered into prior to its enactment and was of no consequence. 313 Ark. at 385, 855 S.W.2d at 302. In *Davis v. Ross Production Co.,* 322 Ark. 532, 910 S.W.2d 209 (1995), a case involving the breach of the implied covenant to develop, we noted the statute in passing because Davis suggested

> that this court establish, as a matter of law, a specific, maximum time period of inactivity after which an oil and gas lease would be subject to cancellation for failure to drill and develop the leasehold. Davis cites ... § 15–73–201 ... wherein the General Assembly has provided that

one year beyond the primary term of the lease or one year within completion of a well is a maximum time the lessee can hold by production, lands outside a unit or pool in which there has been no production or exploration. Davis suggests this court adopt a period of ten years, rather than one year, as a matter of public policy. We choose not to do as Davis requests. As we have stated many times, it is for the General Assembly, not the courts, to establish public policy.

322 Ark. at 541, 910 S.W.2d at 214 (internal citations omitted).

The lease in this case allowed for extension "as long thereafter as oil, gas or other hydrocarbons are produced from said leased premises or from lands pooled therewith" and as long as drilling operations were commenced within the primary term and "so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained." Here, there is no dispute that Chesapeake commenced drilling on the Snowdens' property within Section 29 prior to the end of the primary term and continued therewith until the well had been completed and began producing. Therefore, by the express terms of the lease it was extended past the primary term. The question presented to this court is whether § 15–73–201 operates to limit extension of the lease to just the area where production had occurred—Section 29—or whether the lease was extended to all lands under the lease.

Applying the plain language of the statute, we must affirm the circuit court's grant of summary judgment in favor of Chesapeake. The Snowdens claim that

§ 15–73–201(a) functions to limit the extension of these types of leases to only the sections or pooling units where production has occurred. They argue that the circuit court misapplied the statute in extending the lease to the entire acreage. The Snowdens are correct that subsection (a) operates to sever producing sections or pooling units from non-producing sections or pooling units for the purposes of the extension of the lease. It is, in effect, a statutory Pugh Clause that modifies the normal language of a lease to provide that operations or production from a section or pooling unit will not hold the entire lease but, instead, only maintains the lease as to that part of the lease acreage which is actually producing. *See* 58 C.J.S. *Mines and Minerals* § 310 (2010). Consistent with a traditional Pugh Clause, subsection (a) severs producing units or sections from non-producing units or sections despite the fact that leased lands are normally considered indivisible. *Id.*

However, our analysis does not stop at subsection (a). The language of subsection (b) states that the section "shall not apply" where drilling has commenced on "any part of lands in sections or pooling units under the lease" within a year of the expiration of the primary term of the lease or within one year of the completion of a well on "any part of lands in sections or pooling units under the lease." [3] Here, Chesapeake drilled on the Snowdens' land in Section 29 within a year after the expiration of the primary term, and it commenced drilling and completed two additional wells on Section 29 within that year, the last well being completed on September 9, 2009. [4] Thus, pursuant to the stat-

---

[3] The dissent would have us interpret subsection (b) of the statute as saying "any *other* part" of lands under the lease. Rewriting the statute is the legislature's responsibility, not ours.

[4] Again, we note the discrepancy between the facts presented by Chesapeake that the last

ute's plain language, the circuit court properly granted summary judgment in favor of Chesapeake. Subsection (a) of the statute would operate to sever Section 29—the producing unit—from the Snowdens' other leased acreage for the purposes of extending the lease. However, by commencing drilling within a year of the expiration of the primary term, the statute unambiguously states that subsection (a) did not apply to sever the producing section from non-producing units. Therefore, the lease was extended to all lands under the Snowdens' lease, not just the producing section. Furthermore, Chesapeake completed its last well on September 9, 2009. Pursuant to subsection (b), Chesapeake had another year from that date to commence drilling on any section or pooling unit under the lease to continue to extend the lease to all leased lands, producing and non-producing, and prevent the operation of subsection (a), which would sever the lease as to non-producing sections or pooling units.

We note that throughout their arguments on appeal, the Snowdens refer to the implied covenant to develop. In *Ezzell v. Oil Associates*, 180 Ark. 802, 810, 22 S.W.2d 1015, 1018 |₁₁(1930), we discussed the implied covenant and defined it as follows:

> So it may be taken as the well-settled rule in this state that there is an implied covenant on the part of the lessee in oil and gas leases to proceed with reasonable diligence in the search for oil and gas and also to continue the search with reasonable diligence to the end that oil and gas may be produced in paying quantities throughout the whole of the leased premises.

The Snowdens did not allege in their complaint that Chesapeake had breached the implied covenant. Rather, they only alleged a statutory violation. Therefore, the question of whether Chesapeake violated the implied covenant is not properly before this court, and we decline to address it.

■■■ By counterclaim, Chesapeake requested the circuit court suspend its drilling obligations under the lease for the pendency of the litigation. The trial court initially indicated an inclination to grant the relief, but in its written order, it denied the suspension of Chesapeake's obligation. On cross-appeal, Chesapeake asserts that the circuit court erred in denying the request for equitable relief. Chesapeake maintains that due to the expense of drilling, it would be unfair to require it to proceed under its lease obligations despite not knowing whether the lease would be adjudicated valid. Because the Snowdens asserted that the lease had expired as to all lands not within Section 29, where the Jimmy Roberts well had been completed, Chesapeake asked the court to toll its obligations so that it would not have to risk drilling outside of Section 29 while the litigation process continued. Chesapeake cites several cases for support of its position, including *Winn v. Collins*, 207 Ark. 946, 183 S.W.2d 593 (1944).

The Snowdens respond and claim that none of the arguments made by Chesapeake |₁₂warrant reversal of the circuit court's decision. Further, they submit that they never demanded that Chesapeake quit drilling in Section 29, where oil had been produced and there was no dispute that the lease was extended, but rather that they filed suit to clear title to land that they believed was no longer leased to Chesapeake. In other words, the Snow-

well was completed on September 9, 2009, and the trial court's order finding the last well

was completed on August 23, 2009.

dens claim that Chesapeake could fulfill its lease obligations by continuing to develop in Section 29.

In *Winn,* this court stated:

The appellants, by prematurely filing this suit, are estopped from claiming any forfeiture that might have occurred during the pendency of the suit; and the period of time from the filing of this suit until its final disposition is not to be counted against the appellees as a part of the year for the mining of the minimum of 12,000 tons of bauxite from the lease.

207 Ark. at 954–55, 183 S.W.2d at 598. Relying on persuasive authority, we quoted from *Morgan v. Houston Oil Co. of Texas,* 84 S.W.2d 312, 314 (Tex.Civ.App. 1935):

It is well settled that when a lessor determines to forfeit or cancel an oil and gas lease, and puts the lessee on notice thereof, he cannot complain if the latter suspends operations under the contract, pending the determination of the asserted right of the lessor to forfeit or cancel.

Although *Winn* involved a lease to mine the solid mineral bauxite, and we acknowledged that oil-and-gas cases are often not applicable to solid-mineral situations, we applied the equitable principle despite that difference. *Id.* at 953, 183 S.W.2d at 597. In doing so, we found favor in the proposition that a lessee is not bound to expend money mining for minerals where the validity of the lease has been put in peril by the landowner. *Id.* at 953, 183 S.W.2d at 597.

We hold that the equitable principle referred to in *Winn* is applicable to the present case. Therefore, the circuit court's decision on Chesapeake's cross-appeal should be reversed. Here, the Snowdens filed their complaint against Chesapeake alleging that its lease had expired as to all sections other than Section 29. Chesapeake believed its lease was still valid to all the Snowdens' property under the lease. Pursuant to the equitable principle enunciated in *Winn,* Chesapeake was entitled to the equitable relief it requested because the Snowdens attacked the validity of the lease by filing suit and could not thereafter complain that Chesapeake failed to fulfill its obligations under the lease during litigation of the Snowdens' claim. Thus, the circuit court erred in denying Chesapeake's request to suspend its drilling obligations under the lease during the pendency of litigation.

Affirmed on direct appeal; reversed on cross-appeal.

DANIELSON, J., not participating.

WILLS, J., dissenting in part and concurring in part.

WILLS, J., dissenting in part and concurring in part.

This case turns upon the application of Arkansas Code Annotated section 15–73–201 (Repl.2009). The majority considers the statute to be unambiguous and interprets it so that the exception in section 15–73–201(b) applies anytime drilling is commenced on any part of the lands under the lease—including, in this case, on lands in Section 29. The majority also interprets subsection (b) so as to continue the lease as to all leased lands as long as the lessee completes one well a year anywhere on the leased premises, including, in this case, in Section 29. I disagree with this interpretation and agree with the Snowdens that subsection (b) addresses the commencement of drilling in sections of land *other than* those in Section 29. The majority's conclusion renders section 15–73–201(a) a nullity. In addition, although I agree with the majority's resolution of the issue on cross-appeal (regarding Chesapeake's request for suspension of its drilling obli-

gations during the pendency of this litigation), I fail to understand why the majority needs to address that issue in light of its resolution of the statutory issue. I therefore respectfully dissent in part and concur in part.

As the majority notes, this case presents a question of statutory construction and our review is therefore de novo, as it is for this court to determine the meaning of a statute. *Osborn v. Bryant*, 2009 Ark. 358, 324 S.W.3d 687; *City of Little Rock v. Rhee*, 375 Ark. 491, 292 S.W.3d 292 (2009). The basic rule of statutory construction is to give effect to the intent of the legislature. *Rhee, supra.* Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. We construe the statute so that no word is left void, superfluous, or insignificant, and we give meaning and effect to every word in the statute, if possible. *Rhee*, 375 Ark. at 495, 292 S.W.3d at 294 (quoting *Great Lakes Chem. Corp. v. Bruner*, 368 Ark. 74, 82, 243 S.W.3d 285, 291 (2006) (citations omitted)).

If a statute is ambiguous, we must interpret it according to the legislative intent, and our review becomes an examination of the whole act. *Woodrome v. Daniels*, 2010 Ark. 244, 370 S.W.3d 190. When the meaning is not clear, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, and other appropriate means that shed light on the subject. *Potter v. City of Tontitown*, 371 Ark. 200, 264 S.W.3d 473 (2007). As a guide in ascertaining legislative intent, we often examine statutory history as well as conditions contemporaneous with the time of the enactment, the consequences of interpretation, and all other matters of common knowledge within the court's jurisdiction. *Lawhon Farm Servs. v. Brown*, 335 Ark. 272, 984 S.W.2d 1 (1998); *Citizens to Establish a Reform Party v. Priest*, 325 Ark. 257, 926 S.W.2d 432 (1996). In construing statutes, we will not presume the legislature to have done a vain and useless thing. *Phillips Petroleum Co. v. Heath*, 254 Ark. 847, 497 S.W.2d 30 (1973). Finally, we reconcile provisions to make them consistent, harmonious, and sensible. *Woodrome, supra.*

In my view subsection (a) of the statute is unambiguous. It states that

[t]he term of an oil and gas, or oil or gas, lease extended by production in quantities in lands in one (1) section or pooling unit in which there is production shall not be extended in lands in sections or pooling units under the lease where there has been no production or exploration.

This provision has been referred to as a "statutory Pugh clause." Patrick H. Martin, *Implied Covenants in Oil and Gas Leases—Past, Present and Future*, 33 Washburn L.J. 639 (Summer 1994). We discussed the origin of such clauses in *Bibler Bros. Timber Corp. v. Tojac Minerals, Inc.*, 281 Ark. 431, 664 S.W.2d 472 (1984):

In 1947, Lawrence G. Pugh, a lawyer in Crowley, Louisiana recognized that a lease was normally held to be indivisible. He drafted a clause calculated to prevent the holding of non-pooled acreage in his clients' leases while other portions were being held under pooled arrangements. These clauses were termed "Pugh clauses".... Williams and Meyers' Oil and Gas Terms, p. 602 defines a Pugh clause as "a type of pooling clause which provides that drilling operations on or production from a pooled unit or

units shall maintain the lease in force only as to lands included within such unit or units."

*Bibler Bros.*, 281 Ark. at 435, 664 S.W.2d at 474.

The facts in *Bibler Bros.* were quite similar to the facts in this case. In *Bibler Bros.*, the lessor of oil and gas rights sought to cancel part of a lease by asking a court of equity to "vertically sever" the lessees' oil and gas rights in lands lying outside a producing unit from the lessees' oil and gas rights in lands located within the producing unit. The lease at issue in *Bibler Bros.* encompassed some 1766 acres in six different sections of land and provided for a primary term of ten years. Drilling was commenced in one section—Section 1—about three weeks before the primary term of the lease expired. The lands in Section 1 had been pooled by compulsory order of the Arkansas Oil and Gas Commission. *Bibler Bros.*, 281 Ark. at 432, 664 S.W.2d at 473.

The lessors filed suit to cancel the lease on the other five sections of land, comprising 1406 acres, which were not included in the producing unit. In doing so, they relied upon the provisions of the lease.[1] The applicable provisions of the lease gave the lessee the right to pool or unitize its estate in order to create a drilling or production unit. It also included the standard provision that production from a well on the drilling unit would have the same effect as if the well were drilled on land embraced by the lease. *Id.* at 432–33, 664 S.W.2d at 473. It also included the statement that: "In the event however that only part of the lands embraced by the lease are included in a unit created hereunder, then the remaining portion of the lands embraced by this lease shall be subject to delay rental payments as provided in Paragraph 4." *Id.* at 433, 664 S.W.2d at 473. The lessors contended that this sentence created a "vertical severance" of the lease, arguing that:

> only a part of the lands embraced by this lease were included in a pooling agreement, that is 360 of the 1766 acres. Thus, the remaining portion of lands embraced by the lease was still subject to the delay rental payments and since no delay rental payments were required to be paid after the primary term of the lease, the lease could only be extended to unitized or pooled areas that were actively drilling for oil or gas.

*Id.*

This court disagreed, however, concluding that the lease provision was only applicable to *voluntary* pooling by the lessee, and not where a particular unit had been pooled by compulsory order of the Oil and Gas Commission. *Id.* at 433–34, 664 S.W.2d at 474. The language in the applicable provision applied only to "unit[s] created hereunder," meaning units created by virtue of the lessee's rights under the lease. *Id.* at 434, 664 S.W.2d at 474. This court also disagreed with the lessors that the provision operated as a "Pugh clause," stating "[t]he lease before us does not state the lease will be in effect only as to unitized lands. Instead, it states that the lands outside the unit are subject to delay rentals. . . . Since . . . delay rentals are not owing after the lessee commences drilling or after the primary term of the lease, the language fails as a Pugh clause and also fails to impose delay rentals." *Id.* at 435, 664 S.W.2d at 474. In making its conclusion, this court noted the "strong mandate" found in case law that an "oil and

---

1. Act 330 of 1983, which is the source of section 15–73–201, had not yet been enacted. It was introduced and adopted during the pendency of the litigation in *Bibler Bros.* and applies to all leases entered into on or after its effective date.

gas lease is an indivisible obligation in the absence of express provision to the contrary." *Id.* at 434, 664 S.W.2d at 474.

As pointed out above in footnote 1, Act 330 of 1983 was introduced and adopted during the pendency of the *Bibler Bros.* litigation. The *Bibler Bros.* litigation is thus a circumstance contemporaneous to the adoption of Act 330 that may be considered in determining the proper construction of section 15–73–201. Subsection (a) of that statute unambiguously provides a statutory Pugh clause—that "[t]he term of an oil and gas, or oil or gas, lease extended by production in quantities in lands in one (1) section or pooling unit in which there is production shall not be extended in lands in sections or pooling units under the lease where there has been no production or exploration." Subsection (a) of the statute thus creates, by operation of law, the same result typically negotiated by the parties in a "Pugh clause." The purpose of subsection (a) is to create a "severance" of the nonproducing units from a producing unit.

The difficulty in this case is not the proper construction of subsection (a). All parties agree on its effect. The difficulty is the proper construction of subsection (b), which creates an exception to subsection (a). The parties, the trial court, and the justices of this court differ as to whether subsection (b) is ambiguous. The Snowdens' argued at the hearing that it was "very ambiguous"; Chesapeake maintains that it is unambiguous; and the circuit court found it unambiguous, as apparently does the majority. The parties, the circuit court, and this court, however, each read the subsection as leading to different results. In my view, subsection (b) is ambiguous. *See Koch v. Adams,* 2010 Ark. 131, 361 S.W.3d 817 (A statute is ambiguous only where it is open to two or more constructions, or where it is of such ob-

scure and doubtful meaning that reasonable minds might disagree or be uncertain as to its meaning.). As such, this court must engage in a search for the legislative intention. We must harmonize the two subsections, giving effect to each, in an effort to read them as a whole. *See Ark. Beverage Retailers Ass'n v. Langley,* 2009 Ark. 187, 305 S.W.3d 427 ("We reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part.").

Subsection (a) of the statute is the operative portion. Subsection (b) then creates an exception to subsection (a). The operative effect or purpose of subsection (a) is to create—by operation of law and despite any contrary lease language—*a severance.* It severs non-producing sections or units from producing units or sections, despite the historical treatment of such leased lands as indivisible. Subsection (b) then states that "[t]his section shall not apply" in certain circumstances. The original Act 330 of 1983, section 3, states that "[t]his Act shall not apply when drilling operations have commenced on any part of lands under the lease ... within one year...." The effect of this exception is to provide that *the severance* provided for in subsection (a) does not apply where drilling operations have commenced within the applicable time period. The lease remains indivisible as to any such lands.

"This section," as used in subsection (b), refers to the operative effect of subsection (a). The phrase "[t]his section shall not apply" means that the severance provided in subsection (a) does not apply "when drilling operations have commenced on any part of lands in sections or pooling units under the lease" within the applicable time period. Those parts of land will not be severed from the original portion where drilling has commenced. The "severance" created by subsection (a), however, has no

relation in the first place to lands like those in Section 29. Subsection (a) does not purport to sever those lands from anything. Drilling operations have unquestionably already commenced in that Section. Section 29 is the portion of lands from which other portions might be severed. Thus, reading the two subsections together and with their purpose in mind, it becomes clear that subsection (a) has no operative effect on Section 29 and it is therefore not embraced within the exception language of subsection (b). Subsection (b), as the Snowdens argue, applies only to Sections other than those in Section 29. This is the argument the appellants made below, wherein they stated that subsection (b) "would give an extension of one year basically after the lease expired that they have to initiate drilling in these other eight sections." They continue to make this argument on appeal, and they are correct.

The majority's conclusion that the drilling in Section 29 extends the term of the lease in other sections of land renders subsection (a) a nullity. There will always be drilling in the original section—in this case, Section 29—and to construe the exception as including drilling in that section would swallow the rule. There would never be a severance of any of the other sections from the original section because drilling will have always been commenced in the original section. We will not presume the legislature to have done a vain and useless thing. *Phillips Petroleum Co. v. Heath, supra.*

The majority agrees with the argument put forth by Chesapeake to keep its construction of the statute from being a nullity. Chesapeake focuses on the latter language of subsection (b), which defeats the severance where drilling operations have commenced "within one year of the primary term, or within one year after the completion of a well." Chesapeake argues, and the circuit court apparently agreed, that this provision applies to drilling in Section 29, and "the lease is continued in effect as to all the leased property for one year from the completion of the last well drilled" and that "the statute's apparent intent is to require the lessee to drill at least one well per year after the expiration of the primary term . . . to avoid the effect of subsection (a)."

This argument and the trial court's conclusion in this regard are erroneous. Although this latter clause in subsection (b) is the most ambiguous portion of the statute, in my view, it relates only to the timing of the lessee's obligation to commence drilling in the *other* sections. As concluded above, under the first clause of subsection (b), the lessee has one year from the expiration of the primary term to commence "drilling operations" in the other sections, or else they are severed from the lease. The reference to the completion of a well, in my view, extends the time period within which the lessee must commence drilling operations in those sections. Where the lessee has not yet commenced drilling in another section within the one-year deadline, but has nonetheless completed a well in that section within that one-year period, this clause of subsection (b) gives the lessee a year from the completion of the well to actually commence drilling in that section. In my view, this clause of subsection (b) does not refer to the completion of any wells in Section 29.

This court characterized the operation of subsection (b) in this fashion in *Davis v. Ross Production Co.,* 322 Ark. 532, 910 S.W.2d 209 (1995), stating:

[In] Ark.Code Ann. § 15–73–201 (Repl.1994) . . . the General Assembly has provided that one year beyond the primary term of the lease *or one year within completion of a well is a maxi-*

*mum time the lessee can hold by production,* lands outside a unit or pool in which there has been no production or exploration.

*Davis,* 322 Ark. at 541–42, 910 S.W.2d at 214 (emphasis added). This court described section 15–73–201 as creating a "maximum time" that the lessee can hold non-producing lands—either one year beyond the primary term *or* one year within completion of a well. Under the majority's reasoning, there would be no "maximum time" that non-producing lands could be held. They could be held from year to year *ad infinitum* upon the completion of a well in any one section under the lease. In my view, this reading of subsection (b) renders subsection (a) a nullity. The majority's reading of the statute continues the traditional notion of an indivisible lease, despite the General Assembly's efforts to modify that notion in section 15–73–201(a).

I therefore respectfully dissent from the majority opinion. Because it is clear that no activity of any kind has commenced in any section other than Section 29, I would reverse the circuit court on this point.

I agree with the majority's conclusion on the cross-appeal, regarding whether Chesapeake's drilling obligations should have been suspended during the pendency of this litigation. I do not understand, however, why it is necessary for the majority to reach that issue in light of its conclusion regarding the effect of the statute. Because the majority concludes that the lease extends to all sections of the Snowdens' land and continues for as long as Chesapeake complies with the lease terms, the logical result under that construction of the statute would render Chesapeake's cross-appeal moot. Under my construction of the statute, however, the issue on cross-appeal is still very much alive.

In this case, the primary term of the lease expired on February 11, 2008. The Snowdens filed suit on May 19, 2008. As of that date, the one-year period for commencing drilling operations in sections other than Section 29 had not yet expired. This lawsuit was, like the case of *Winn v. Collins,* 207 Ark. 946, 183 S.W.2d 593 (1944), "prematurely filed." In *Winn,* the Winns entered into a mineral lease with Collins on January 29, 1943; under the terms of the lease, Collins had ninety days to begin active mining operations on the leased land and was required to remove a minimum of 12,000 tons of bauxite per year. *Winn,* 207 Ark. at 948, 183 S.W.2d at 595. On January 31, 1944, the Winns filed suit to cancel the lease, contending that Collins had failed to begin active mining operations within the required time and had failed to market the minimum tonnage from the land. *Id.* at 949, 183 S.W.2d at 595. The chancery court, however, determined that the Winns were not entitled to cancel the lease. *Id.* at 950, 183 S.W.2d at 596.

On appeal, this court rejected the Winns' argument that Collins had failed to remove the required 12,000 tons of bauxite within one year of the signing of the lease. The court cited the language of the lease, which provided that, if active mining operations had begun within ninety days from the date of the lease, then the lease would remain in full force and effect "so long as active mining operations are conducted therein, with this provision, that a minimum tonnage of 12,000 tons per annum is removed from said lands annually." *Id.* at 951, 183 S.W.2d at 596. The court construed this language as meaning that Collins had one year from the date that active mining operations commenced to produce the required tonnage; because active mining operations did not commence until April 28, 1944, the Winns had no cause of action on the minimum tonnage require-

ment when the suit was filed on January 31, 1944. *Id.* at 952, 183 S.W.2d at 597. Their suit having been filed prematurely, the period of time in which the suit was pending could not count against Collins's time in which to produce the tonnage. *Id.* at 953, 183 S.W.2d at 597. The Winns were estopped from claiming any forfeiture that might have occurred during the pendency of the suit, and the time from the filing of the suit until its final disposition would not count against Collins as part of the one-year period for mining the minimum tonnage. *Id.* at 954, 183 S.W.2d at 598.

Similarly, in the present case, the Snowdens' suit was filed prematurely. As noted above, as of the date they filed their complaint, the one-year period for commencing drilling operations in sections other than Section 29 had not yet expired. Chesapeake was understandably concerned about its continuing obligation to drill and was understandably reluctant to begin any drilling operations in other sections of land where the outcome of this litigation might determine that those sections had been severed from its leasehold. Accordingly, I agree with the majority that the circuit court should have tolled Chesapeake's drilling obligations during the pendency of the litigation and therefore concur on this point.